Jeff S. Westerman (SBN 94559)
jwesterman@ahdootwolfson.com
AHDOOT & WOLFSON, PC
2600 W. Olive Ave., Suite 500
Burbank, California 91505
Telephone: 310.474.9111
Facsimile: 310.474.8585

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINA M. INNARELLA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN HONDA MOTOR CO., INC., HONDA MOTOR CO., LTD., and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:26-cv-12679<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; BREACH OF CONTRACT; BREACH OF EXPRESS WARRANTY; BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY; VIOLATION OF STATE WARRANTY STATUTES; VIOLATION OF STATE CONSUMER PROTECTION STATUTES; COMMON LAW FRAUD; AND UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

## Table of Contents


INTRODUCTION ........ - 4 -
PARTIES ........ - 11 -
A. Plaintiff ........ - 11 -
B. Defendants ........ - 12 -
JURISDICTION AND VENUE ........ - 13 -
FACTS ........ - 15 -
A. American Honda and Honda Motor ........ - 15 -
B. Defendants' PKE Systems ........ - 15 -
1. Relay Theft ........ - 21 -
2. Electronic Software Entry ........ - 23 -
3. Rolling PWN Attacks in Honda Vehicles ........ - 24 -
4. Key Cloning ........ - 24 -
5. After Accessing The Vehicle ........ - 25 -
6. Common Anti-Theft Solutions ........ - 26 -
7. OBD Port Locks ........ - 28 -
8. Standards In The U.S. Automobile Market ........ - 29 -
C. Defendants' Knowledge of The Theft Crisis ........ - 33 -
TRADE AND COMMERCE ........ - 42 -
CALIFORNIA LAW APPLIES NATIONWIDE TO THE CLAIMS IN THIS LITIGATION ........ - 43 -
INJURY AND THREATENED INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS ........ - 43 -
CLASS ACTION ALLEGATIONS ........ - 44 -
A. Tolling the Statute of Limitations ........ - 46 -
1. Discovery Rule ........ - 47 -
2. Fraudulent Concealment ........ - 48 -
3. Continuing Violation of Law ........ - 48 -
4. Estoppel ........ - 49 -
FIRST CLAIM FOR RELIEF ........ - 49 -
SECOND CLAIM FOR RELIEF ........ - 52 -
THIRD CLAIM FOR RELIEF ........ - 54 -
FOURTH CLAIM FOR RELIEF ........ - 57 -
FIFTH CLAIM FOR RELIEF ........ - 62 -
SIXTH CLAIM FOR RELIEF ........ - 68 -
SEVENTH CLAIM FOR RELIEF ........ - 72 -
EIGHTH CLAIM FOR RELIEF ........ - 74 -
PRAYER FOR RELIEF ........ - 74 -

JURY DEMAND ........................................................................................ - 75 -

Plaintiff Trina M. Innarella ("Plaintiff"), individually and on behalf of herself and classes of all those similarly situated, brings this class action for damages and injunctive relief against American Honda Motor Co., Inc. ("American Honda"), Honda Motor Co., LTD. ("Honda Motor") and Does 1 through 10, inclusive (collectively, "Defendants" or "Honda") based upon: (i) her personal knowledge as to the facts specific to her contained in paragraphs 27-29; (ii) the investigation of counsel; and (iii) publicly available information. Plaintiff alleges as follows:

## INTRODUCTION

1. Motor vehicles are an indispensable and costly mode of personal transportation. For most Americans, purchasing a vehicle is one of the biggest financial commitments they will make outside of buying a home.[1]

2. The theft of one's vehicle seems incomprehensible until it happens. But it is happening with alarming regularity in the United States. In 2024, a motor vehicle was stolen in the United States every thirty-six seconds, totaling approximately 850,000 vehicle thefts.[2]

3. This lawsuit concerns Defendants' vehicles that are equipped with passive keyless entry systems (the "passive keyless entry systems" or "PKE systems"), which are especially vulnerable to theft because Defendants' PKE systems are unsecure.

4. Defendants' Acura TLX 4WD, Acura TLX 2WD, and Honda CR-V hybrid 4WD, for instance, ranked in the top 20 most stolen vehicles for 2022 to 2024 model years in the United States.[3] Those models are equipped with PKE systems.

---

[1] https://www.prnewswire.com/news-releases/buying-a-car-through-a-dealership-what-american-consumers-should-know-302568441.html (last visited June 16, 2026).

[2] https://www.nhtsa.gov/vehicle-safety/vehicle-theft-prevention (last visited June 16, 2026).

[3] https://www.iihs.org/news/detail/camaro-zl1-tops-chart-of-most-stolen-vehicles (last visited June 16, 2026).

5. The inherent features of Defendants' PKE systems make Defendants' vehicles prime targets for theft.

6. There are simple and cost-effective solutions to this burgeoning crisis in vehicle theft. Yet, large automobile manufacturers, like Honda, have failed to act to address this problem—at the expense of U.S. customers and in furtherance of their bottom line.

7. A PKE system allows a vehicle to be opened without handling or depressing a button on the vehicle's electronic key fob. An electronic chip in the key fob functions as a transmitter emitting a wireless signal that communicates with the vehicle's on-board computer to allow vehicle access simply by operating the door handle. The fob also allows the vehicle to be started once a start/stop ignition button in the vehicle is depressed.

8. But this feature creates serious vehicle security issues, which automobile manufacturers, including Honda, have been aware of and ignored since at least 2011. In 2011, researchers at the University of California and the University of Washington published a paper which found that keyless entry systems could be exploited and vehicle software and security systems subverted to unlock doors and start engines.[4] In 2012, a University of London, *Computer Law and Security Review* article noted "there has been insouciance and ignorance by the motoring industry, not wanting to pay the price for proper security."[5]

9. The exploitation of PKE systems by thieves in the United States has recently surged. Automobile manufacturers' responses have been so lethargic that U.S. Senator Edward Markey issued letters to 17 manufacturers, including American Honda,

---

[4] https://www.theguardian.com/uk-news/2024/feb/24/revealed-car-industry-was-warned-keyless-vehicles-vulnerable-to-theft-a-decade-ago (last visited June 16, 2026).

[5] Stephen Mason, *Computer Law & Security Review* 28, pp. 195-200 (2012).

requesting information concerning their keyless entry systems and their efforts to address the vulnerability problem engendered by them.[6]

10. On April 22, 2026, the U.S. Attorney's Office for the District of Columbia unsealed a 15-count indictment and brought charges against six individuals for their role in an international auto theft ring conspiracy that stole at least 20 cars in the Washington D.C. metropolitan area and Pennsylvania and sold them to buyers in the United States and Africa.[7]

11. The vehicles, which were "primarily recently manufactured Honda Civics and CRVs and Acura TLXs and RDXs," were stolen via keyless entry theft "using electronic devices that enabled the conspirators to reprogram cars to accept previously blank key fobs."[8]

12. As the U.S. Attorney stated at a press conference: "They don't need keys and they don't need hot wiring. No smashed windows. No Drama. Just a sleek electronic device called an Autel," and in "under a minute, the car's brain is rewritten, and the car is gone in 60 seconds."[9] Thieves disconnect the GPS and the Bluetooth on the car, load the vehicles on transport carriers, and ship them overseas.[10]

13. Honda has known for at least 15 years that its vehicles' PKE system creates vehicle security issues and facilitates the theft of the vehicles it manufactures, markets, and sells. Honda's PKE system is now standard in most of its vehicles,

---

[6] https://www.markey.senate.gov/news/press-releases/senator-markey-urgesautomakers-to-review-safety-of-keyless-systemsas-tech-savvy-thieves-circumvent-locks (last visited Oct. 28, 2026).

[7] https://www.justice.gov/usao-dc/pr/international-car-theft-ring-busted (last visited Oct. 28, 2026).

[8] *Id.*

[9] https://www.youtube.com/shorts/2rSyNcUZnj0 (last visited Oct. 28, 2026).

[10] *Id.*

including various makes and models that are among the most stolen cars in the United States.

14. Honda PKE-equipped vehicles are among the most stolen vehicles in the United States.[11] Thieves exploit Honda and Acura vehicles equipped with PKE systems and take control of the vehicles by: (i) relay theft; (ii) electronic software entry theft; (iii) rolling PWN attacks; and (iv) key cloning theft.

15. "Relay theft" occurs when a thief uses an antenna to amplify the encrypted signal emitted from the nearby vehicle key fob. The boosted signal tricks the vehicle into believing the key fob is within three feet and permits vehicle entry.

16. Upon gaining entry, thieves plug a device into the vehicle's unsecured On-Board Diagnostic ("OBD") port to code a new key. The OBD port is an unsecured standard 16-pin connector usually found under the dashboard. The OBD port was designed to provide technicians with access to the vehicle's computer system in order to run diagnostic tests and monitor the vehicle's engine performance, emissions, and fuel efficiency.

17. "Electronic software entry theft" occurs when thieves, armed with a laptop and sophisticated software—available for purchase by anyone on the internet—park near a Honda or Acura vehicle equipped with a PKE system. Thieves use the software to emit a covert signal to "awaken" the vehicle's security system and open its doors. As with "relay theft," once inside, thieves plug into the unsecured OBD port to code a new key or otherwise bypass security and drive away with the vehicle. The time it typically takes a thief to "awaken" a PKE-equipped vehicle using the "electronic software entry" technique, plug into the OBD port, and create a new key is typically less than two minutes.

---

[11] https://www.cbsnews.com/news/most-stolen-cars-chevrolet-camaro-zl1-theft-rates/ (last visited June 16, 2026).

18. The "Rolling-PWN system" vulnerability enables attacks whereby codes can be intercepted from the key fob to allow an attacker equipped with a software defined radio ("SDR") to unlock a Honda vehicle.

19. "Key cloning" occurs when a thief uses a vehicle's unique Vehicle Identification Number ("VIN") to obtain a new manufacturer's key from a foreign entity that will provide a coded key for a fee. A VIN is a unique 17-character code assigned to a particular vehicle. It is located on the bottom-corner of the driver's windshield and is capable of being viewed from outside the vehicle. After easily copying down a vehicle's VIN—and thereafter obtaining a cloned key—the thief can unlock the vehicle as if using the original key and simply drive away. "Key cloning" can also occur using devices, such as an Autel, an electronic device available on the internet that can reprogram a blank key fob into a fully functioning key capable of connecting to any vehicle.[12] The U.S. Attorney's Office in Washington D.C. suspected the Autel was used in the keyless entry theft of at least 20 vehicles—primarily Honda and Acura vehicles—by the international car theft ring.[13] The Autel can be purchased online by anyone for under $600.[14]

20. No matter the mode of theft, once inside a stolen vehicle, thieves invariably remove the tracking device installed by a manufacturer in a well-known and easily accessible location.

21. There are common, cost-effective anti-theft technologies that offer a solution that would prevent thieves from driving away with Defendants' vehicles after

---

[12] https://local12.com/news/local/thieves-using-new-technology-steal-cars-warren-county-community-crime-spike-theft-break-in-car-vehicle-technology-keys-apartments-hotels-surveillance-dangerous-autel-scanner-black-market-selling-sold-cincinnati-ohio (last visited Oct. 28, 2026).

[13] *See supra* note 9.

[14] https://www.locksmithkeyless.com/products/autel-maxiim-km100-universal-key-generator-with-4-free-autel-remotes (last visited Oct. 28, 2026).

exploiting their PKE systems. For example, aftermarket stealth CANbus vehicle immobilizers ("Stealth Immobilizers"). Stealth Immobilizers are designed to address theft methods involving relay attacks, key cloning, OBD-based theft attempts, and electric bypass methods, even where a thief has gained access to the vehicle or compromised the factory keyless-entry/start system.[15]

22. AUTHOR IGLA ("IGLA") manufactures, markets, and sells aftermarket Stealth Immobilizers.[16] The immobilizers use a vehicle's standard CAN/LIN electrical architecture to provide a separate authorization layer before the vehicle can be started or driven.[17] IGLA employs engine-blocking technology through standard electric circuits, requiring secure authorization by key fob, smartphone, or a PIN code entered through the vehicle's existing factory buttons, and using standard dashboard indicators to ensure stealth of operation.[18] IGLA's supported-car materials identify both Honda and Acura branded vehicles as being among the motor vehicle makes supported by the IGLA Stealth Immobilizer product.[19]

23. The use of aftermarket Stealth Immobilizers results in a clear and proven reduction in theft.[20] Yet, Defendants continue to sell Honda and Acura branded vehicles equipped with unsecure PKE systems without disclosing the defect to buyers,

---

[15] https://iglaglobal.com (last visited June 16, 2026).

[16] https://author-alarm.com/catalog/anti_theft/author_igla_kit_2xkeyfob/ (last visited June 16, 2026).

[17] *Id.*; https://www.iglausa.com/how-it-works (last visited June 16, 2026).

[18] https://author-alarm.com/catalog/anti_theft/author_igla_kit_2xkeyfob/ (last visited June 16, 2026).

[19] https://author-alarm.com/catalog/anti_theft/author_igla_kit_2xkeyfob/ (last visited June 16, 2026).

[20] Jan C. van Ours and Ben Vollaard, The Engine Immobiliser: A Non-Starter for Car Thieves, 126 ECON. J. 1264, 1266 (2016), which can be found at https://onlinelibrary.wiley.com/doi/abs/10.1111/ecoj.12196 (last visited June 16, 2026).

informing them that countermeasures, such as Stealth Immobilizers or OBD port locks, are available, or including those or other equivalent anti-theft technologies in their vehicles.

24. The cost of installing certain anti-theft devices to prevent the activation of a Honda or Acura vehicle's engine without a key is often minimal. For example, Defendants have not employed the use of aftermarket Stealth Immobilizers in their PKE-equipped vehicles sold to or leased by customers, which often cost under $800 and well below that price to the manufacturer.[21] Defendants have not offered Stealth Immobilizers for aftermarket sale at U.S. authorized Honda and Acura dealerships, and Defendants have not notified their customers that such products—or equivalent anti-theft products—are available to address the security vulnerabilities in their PKE-equipped vehicles.

25. Defendants are engaged in unfair, deceptive, fraudulent, and unconscionable commercial trade practices in California and across the United States by failing to disclose material information concerning Defendants' PKE system vulnerabilities when selling, leasing, or servicing their vehicles in California and across the United States. Honda and Acura vehicle purchasers, owners, and lessees are deprived of the knowledge of, and the opportunity to employ, commonly available technology such as aftermarket Stealth Immobilizers and OBD port locks to protect their Honda and Acura vehicles.

26. Plaintiff and the members of the Classes (defined below) who have purchased, owned, or leased new Honda and Acura vehicles equipped with PKE

---

[21] Most Immobilizers can be installed aftermarket in the U.S. for under $800. See https://vanguardautodesign.com/immobilizer/; https://www.pandoracaralarms.com/storm-immobilizer-canbus; see also https://scorpiontrack.com/product/scorpion-x-series-can-bus-immobiliser/?srsltid=AfmBOoqm3yxW_IY1xgumJfCduOdfypUs41MQFy9NM1fFkWalvFLwL0DS

systems have been financially injured. Accordingly, Plaintiff brings this action for damages and injunctive relief individually and on behalf of all other similarly situated individuals who have suffered financial harm stemming from Defendants' PKE-equipped vehicles' security vulnerabilities, as well as curative notice disclosing to all Honda and Acura vehicle owners in the United States the risks posed by PKE systems in Honda and Acura vehicles and the security options available to them to counteract such risks.

## PARTIES

### A. Plaintiff

27. Plaintiff **Trina M. Innarella** is a citizen and resident of New Jersey. In 2023, she purchased a 2024 Honda Civic Sport, a Civic trim equipped with a PKE system from Madison Honda, a Honda dealership located in New Jersey. Ms. Innarella purchased and financed the vehicle for personal, family and/or household use. The vehicle was purchased using personal funds and is maintained at Ms. Innarella's residence.

28. Ms. Innarella regularly services her car at Madison Honda. The services she has purchased include oil changes and rim repairs.

29. Plaintiff purchased her vehicle after reading Defendants' advertising, statements, and representations that the vehicle was safe, reliable, and of extremely high quality.

30. Defendants publicly touted their PKE-equipped vehicles' convenience, safety, reliability, and quality.

31. Plaintiff purchased a vehicle of a lesser standard, grade, and quality than represented by Defendants and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding design quality, safety, and reliability. The security vulnerabilities in Plaintiff's PKE-equipped vehicle, and all other PKE-equipped Honda and Acura vehicles, significantly diminished the value of Plaintiff's vehicle and those of members of the Classes.

32. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered an ascertainable financial loss.

**B. Defendants**

33. Defendant **American Honda** is a corporation organized under the laws of California with its principal place of business and main U.S. headquarters at 1919 Torrance Blvd, Torrance, California 90501. American Honda is a wholly owned subsidiary of Honda Motor, its parent company. As a subsidiary of Honda Motor, American Honda received material information concerning the security vulnerabilities on Defendants' vehicles equipped with PKE systems. It also received this information from its authorized U.S. dealers who received complaints from Defendants' customers. At all relevant times, American Honda acted as the authorized agent, representative, servant, employee and/or *alter ego* of Honda Motor while performing activities including but not limited to advertising, warranty, warranty repairs, dissemination of technical information, and monitoring Defendants' vehicles equipped with PKE systems in the U.S. At all relevant times, Defendants manufactured, distributed, sold, leased, and/or warranted Honda and Acura vehicles equipped with PKE systems in the U.S.

34. Defendant **Honda Motor** is a Japanese corporation headquartered in Japan located at Toranomon Alcea Tower, 2-2-3 Toranomon, Minato-ku, Tokyo, 105-8404, Japan. Honda Motor is the global parent and ultimate source of vehicle design, engineering, manufacturing, safety, cybersecurity, and brand-control decisions for Honda and Acura vehicles equipped with PKE systems.

35. Defendants **Does 1 through 10**, inclusive, are persons or entities whose true names and capacities are presently unknown to Plaintiff, who therefore sues them by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each of the Doe Defendants is responsible in some manner for the conduct alleged herein, and that Plaintiff's and Class members' damages were proximately caused by

their conduct. Plaintiff will seek leave of Court to amend this Complaint to allege the true names and capacities of Does 1 through 10 when they are ascertained.

36. Defendants' principal activity is the design, development, manufacture, marketing, and sale of motor vehicles bearing the Honda and Acura brand names. Defendants sold approximately 1.43 million Honda and Acura vehicles in the United States in 2025, and reported approximately ¥11.3 trillion (approximately $74.4 billion) in North American sales revenue for the fiscal year ended March 31, 2025.[22] While Defendants actively promote and market their vehicles equipped with PKE systems, they fail to publicly disclose the passive keyless entry vulnerabilities that plague their cars or institute any plan to correct their vulnerable security systems for the benefit of consumers in California and across the United States.

## JURISDICTION AND VENUE

37. This Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

38. This Court also has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1332(a).

39. The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

---

[22] https://acuranews.com/en-US/releases/release-cf005034e20eb27505fd8e6bbb00c075-american-honda-rides-record-sales-of-light-trucks-and-electrified-models-to-post-sales-increase-in-2025 (last visited October 28, 2026); https://global.honda/en/investors/library/form20_f/main/011/teaserItems3/0/linkList/0/link/FY202503_form20f_e.pdf (last visited June 16, 2026).

40. This Court has personal jurisdiction over Defendants. American Honda's principal place of business is in Torrance, California. Honda Motor, while a Japanese corporation headquartered in Japan, purposefully directed substantial vehicle-related business toward California, including in this District, through its wholly owned subsidiary American Honda. Honda Motor designs, engineers, manufactures, approves, markets, distributes, sells, leases, and/or warrants Honda and Acura branded vehicles equipped with PKE systems for sale and use in California, including within this District, and throughout the United States. At all relevant times, American Honda acted as Honda Motor's authorized U.S. representative for purposes of advertising, marketing, distribution, sales, leasing, warranty administration, warranty repairs, dealer communications, dissemination of technical information, and monitoring of Honda and Acura branded vehicles equipped with PKE systems. Plaintiff's claims arise out of and relate to Defendants' California-directed conduct, including their design, marketing, distribution, sale, lease, warranty, servicing, monitoring, and failure to disclose material security vulnerabilities in Honda and Acura branded vehicles equipped with PKE systems. Exercising jurisdiction over Defendants is reasonable and comports with due process.

41. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), with corporate residency determined under 28 U.S.C. § 1391(c)(2), (c)(3), and (d). American Honda resides in this District by virtue of being incorporated in California, maintaining its principal place of business and headquarters in Torrance, California, and conducting substantial business in this District. Honda Motor is a foreign corporation that may be sued in any judicial district. Further, a substantial part of the events and omissions giving rise to the claims of Plaintiff and the Classes occurred in this District, including Defendants' marketing, distribution, warranty administration, dealer and customer communications, monitoring of complaints and security-related information, and failure to disclose material passive keyless entry security vulnerabilities in Honda and Acura vehicles.

## FACTS

### A. American Honda and Honda Motor

42. Defendants are one of the world's largest motor vehicle manufacturers and sell Honda and Acura vehicles throughout the U.S. American Honda reported annual sales of more than 1.4 million Honda and Acura vehicles in 2024.[23]

43. Honda and Acura vehicles are marketed as reliable, safe, technologically advanced, and suitable for personal and family transportation. Defendants' vehicles are sold to consumers through a nationwide network of authorized Honda and Acura dealerships. Those dealers act as the primary consumer-facing sales, service, and warranty channel for Honda and Acura vehicles sold or leased in the U.S.

44. Plaintiff and members of the Classes purchased or leased their Honda and Acura PKE-equipped vehicles through authorized Honda and Acura dealerships. Plaintiff and members of the Classes understood that those dealerships were acting on behalf of Defendants, which manufactured the vehicles and offered vehicle warranties.

45. The sole and express purpose of authorized U.S. Honda and Acura dealerships is to immediately re-sell Honda and Acura vehicles to California consumers and customers across the U.S., including those equipped with PKE systems.

46. Defendants control the various details concerning their authorized dealerships' operations through various written agreements.

### B. Defendants' PKE Systems

47. Defendants market Smart Entry as their PKE system for Honda vehicles. They say Smart Entry lets the driver "walk up to the vehicle, touch the door handle and open the door, start the engine and shut it off," and then lock the vehicle, "all without ever touching a key." Defendants say the system only requires that the driver possess

---

[23] https://www.hondanews.com/en-US/releases/release-d73d9911716c8277bb60a2789703fcfb-american-honda-rides-strong-second-half-to-nearly-9-annual-auto-sales-increase (last visited June 11, 2026).

the Smart Entry key. They also say the Smart Entry key remains available for ordinary remote use, allowing lock/unlock from up to 50 feet away with a button press.[24]

48. Defendants use similar promotional language in model-specific materials. For example, Defendants' 2026 Honda CR-V page says Smart Entry allows the driver to walk up, touch the door handle, open the door, start the engine, and lock the car "all without ever touching a key."[25] It also states that the tailgate can be opened by touch if the driver possesses the key fob.[26]

49. Defendants' 2026 webpage for the Honda Accord model likewise says Smart Entry lets the driver walk up, open the door, start the engine with push-button start, shut it off, and lock the car without touching a key.[27]

50. Defendants also promote Smart Entry / Walk Away Auto Lock / Push Button Start as a convenience feature. Defendants' 2022 web materials for the Pilot model state that Smart Entry with Walk Away Auto Lock and push-button start make it "exceptionally easy and convenient to unlock, drive and relock the vehicle while never fishing for the keys."[28]

51. Defendants' web materials for the Honda CR-V similarly state that Smart Entry and Push Button Start make it "exceptionally easy and convenient to unlock, drive and relock" the CR-V.[29]

---

[24] https://www.hondainfocenter.com/Shared-Technologies/Exterior/Smart-Entry/ (last visited June 15, 2026).

[25] https://www.hondainfocenter.com/2026/CR-V/Feature-Guide/Exterior-Features/Smart-Entry-and-Push-Button-Start/ (last visited June 15, 2026).

[26] *Id.*

[27] https://www.hondainfocenter.com/2026/Accord/Feature-Guide/Exterior-Features/Smart-Entry-System/ (last visited June 15, 2026).

[28] https://www.hondainfocenter.com/2022/Pilot/Feature-Guide/Exterior-Features/Smart-Entry-and-Push-Button-Start/ (last visited June 15, 2026).

[29] https://www.hondainfocenter.com/2023/CR-V/Feature-Guide/Exterior-Features/Smart-Entry-and-Push-Button-Start/ (last visited June 15, 2026).

52. For Acura vehicles, the comparable system is Keyless Access System with Smart Entry or Smart Entry with Walk Away Auto Lock. The system automatically unlocks the doors when the fob is within range and the door handle is pulled, without taking the fob out of a pocket or purse, and enables push-button start.[30]

53. The Smart Entry with Walk Away Auto Lock system also automatically locks the doors when the driver leaves the vehicle's proximity.[31]

54. Defendants' representations define what Smart Entry and Keyless Access are supposed to do: unlock and start the vehicle for a person who possesses the authorized key fob.

55. Because of the defect, the class vehicles do not perform as represented. The PKE system unlocks the vehicle, and permits the engine to be started for a person who does not possess the key, including a thief relaying the signal of a key fob that remains inside the owner's home.

56. A reasonable consumer, including Plaintiff, understands Defendants' representation that the system works when the driver possesses the key to mean that it will not unlock or start the vehicle for a person who does not.

57. That expectation was part of the bargain at the point of sale. Plaintiff and members of the Classes paid for a keyless access system that would operate only through the deliberate action of an authorized key holder, and they did not receive one.

58. Defendants also make specific representations about the security of their vehicles' theft-deterrent systems.

59. On their Honda Information Center website, Defendants describe the Immobilizer Theft-Deterrent System as a feature of all Honda vehicles and represent

[30] https://www.acurainfocenter.com/2025/RDX/Feature-Guide/Exterior-Features/Keyless-Access-System-with-Smart-Entry/ (last visited June 15, 2026).

[31] https://www.acurainfocenter.com/2026/RDX/Feature-Guide/Exterior-Features/Smart-Entry-with-Walk-Away-Auto-Lock/ (last visited June 15, 2026).

that the system "helps keep Honda vehicles where they belong—in the possession of their owners."[32]

60. The PKE-equipped Class Vehicles do not stay in the possession of their owners. Because of the Defect, a thief can enter a Class Vehicle by relaying the signal of a key fob that remains inside the owner's home, program a new key through the vehicle's unsecured OBD port, and drive the vehicle away, all without the owner's key and without the owner's knowledge.

61. Defendants further represent that "[t]he Honda ignition key features an electronic code that makes it practically impossible to duplicate," and that "[o]nly recognition of this electronic signature by the immobilizer system will allow the fuel-injection system and ignition circuitry to be activated."[33]

62. Defendants make the same promise in the owner's manual for Plaintiff's vehicle model. The manual states that the immobilizer system "prevents a key that has not been pre-registered from starting the engine."[34]

63. In its instructions for starting the engine, the manual further assures owners that "[t]he immobilizer system protects your vehicle from theft. If an improperly coded device is used, the engine's fuel system is disabled."[35]

64. These representations are false and misleading as to the Class Vehicles. As alleged above, devices such as the Autel, which anyone can purchase online for under $600, can program a blank key fob through a Class Vehicle's unsecured OBD

---

[32] *Immobilizer Theft-Deterrent System (All)*, Honda Info Ctr., https://www.hondainfocenter.com/Terms-and-Technologies/_content/Terms-and-Technologies/Immobilizer-Theft-Deterrent-System-All/ (last visited Oct. 20, 2026).

[33] *Id.*

[34] Am. Honda Motor Co., *2024 Civic Sedan Owner's Manual* 190, https://techinfo.honda.com/rjanisis/pubs/OM/AH/AT202424OM/enu/AT202424OMEN.PDF (last visited Oct. 20, 2026).

[35] *Id.* at 449.

port. Far from being "practically impossible to duplicate," a Class Vehicle key can be duplicated by a thief in the time it takes to steal the vehicle.[36]

65. American Honda also expressly warrants the Class Vehicles against defects. Under the New Vehicle Limited Warranty that accompanies every new 2024 Honda vehicle, including Plaintiff's 2024 Civic, American Honda promises that "Honda will repair or replace any part that is defective in material or workmanship under normal use" for 3 years or 36,000 miles, whichever comes first.[37] The PKE system, the immobilizer, and the OBD port are parts of each Class Vehicle covered by that warranty. The Defect was present in each Class Vehicle when it left Defendants' control, yet Defendants have not repaired or replaced the defective components in any Class Vehicle.

66. Defendants began rolling out PKE technology in their U.S.-market vehicles in Acura vehicles before later expanding comparable technology across Honda vehicles. The first production vehicle sold by Defendants in the United States with PKE technology appears to have been the 2005 Acura RL, which they described as the first Acura equipped with the "Keyless Access System," allowing owners to lock and unlock the doors, open the trunk, and start the vehicle without having the remote in hand.[38]

67. Defendants later expanded PKE technology under names including "Keyless Access System," "Keyless Access System with Smart Entry," "Smart Entry Keyless Access System," "Smart Entry with keyless access," and "Smart Entry with Walk Away Auto Lock" to additional Acura models, including the TL, MDX, RDX, ILX, RLX, TLX, ZDX, NSX, Integra, ADX, and related Type S variants, depending on

---

[36] Immobilizer *Theft-Deterrent System (All)*, *supra* at n. 32.

[37] *2024 Honda Warranty Information* 11, Am. Honda Motor Co., https://owners.honda.com/Documentum/Warranty/Handbooks/2024_Honda_Warranty_Basebook.pdf (last visited Oct. 20, 2026).

[38] https://acuranews.com/en-US/releases/release-212c8b8dc0cb3eb9feacda004c34c393-2005-acura-rl-introduction (last visited June 15, 2026).

model year and trim. Defendants later expanded comparable PKE technology to their Honda vehicles under names including "Smart Entry," "Smart Entry & Push Button Start," and "Smart Entry with Walk Away Auto Lock."

68. By the 2013 model year, Defendants advertised Smart Entry & Push Button Start on Honda Accord EX and above models.[39]

69. Defendants thereafter expanded Smart Entry across additional Honda motor vehicle model lines, including the Civic, CR-V, HR-V, Pilot, Odyssey, Ridgeline, Passport, Fit, Insight, Crosstour, CR-Z, Clarity, Prologue, CR-V e:FCEV, and Prelude, depending on model year and trim.

70. Defendants' current U.S. lineup of Honda vehicles equipped with Smart Entry or Smart Entry with Walk Away Auto Lock, at least where standard or optional by trim, includes the Accord, Civic Sedan, Civic Hatchback, Civic Si, Civic Type R, CR-V, CR-V Hybrid, HR-V, Pilot, Passport, Odyssey, Ridgeline, Prologue, CR-V e:FCEV, and Prelude Hybrid. Defendants' current U.S. lineup of Acura vehicles equipped with Keyless Access, Keyless Access System with Smart Entry, or Smart Entry with Walk Away Auto Lock includes the Integra, Integra Type S, ADX, RDX, MDX, and MDX Type S.

71. While PKE was not standard on every Honda or Acura vehicle, model year, or trim, Defendants progressively adopted and expanded PKE technology across their Honda and Acura branded vehicle lineups and equipped the foregoing vehicles with PKE technology in the model years and trims in which Smart Entry, Keyless Access, Smart Entry with Walk Away Auto Lock, push-button start, or comparable proximity-based keyless access/start functionality was standard or optional equipment.

72. PKE technology, including Defendants' PKE technology, involves the use of an electronic key fob, equipped with an internal electronic chip, that transmits a

---

[39] https://hondanews.com/en-US/releases/2013-honda-accord-interior (last visited June 15, 2026).

signal to the vehicle's computer. If a fob is within approximately three feet of the vehicle for which it is programmed, the fob emits a signal that transmits to the PKE antenna in the vehicle.

73. The vehicle's PKE antenna communicates directly with the vehicle's onboard computer. Upon receipt of the proper signal, the vehicle computer provides vehicle access or locks the vehicle without pressing a remote key button. If the fob is in certain proximity to the vehicle antenna, the fob also emits a signal that allows the engine to start when the ignition button is depressed. *See* Illustration A below.

Illustration A.[40]




74. PKE-equipped vehicles, including Defendants' PKE-equipped vehicles, are typically stolen through various means such as: (i) relay theft; (ii) electronic software entry theft; (iii) rolling PWN attacks; and (iv) key cloning.

**1. Relay Theft**

75. The PKE systems in Defendants' PKE-equipped vehicles are highly vulnerable to "relay theft."

[40] https://www.acurainfocenter.com/2026/RDX/Feature-Guide/Exterior-Features/Keyless-Access-System-with-Acura-Personalized-Settings/ (last visited June 23, 2026).

76. "Relay theft" occurs when thieves use an antenna to amplify or boost the signal emitted from a nearby key fob to the vehicle. The impersonation of the key fob tricks the vehicle into believing the key fob is within proximity and allows a person to obtain access to the vehicle. *See* Illustration B below.

Illustration B.[41]




77. Once entry into the vehicle has been achieved through "relay theft," thieves plug a device into the vehicle's unsecured OBD port to create a new key and drive away with the vehicle completely intact.

78. The unsecured OBD port, a standard 16-pin connector usually found under the driver's side dashboard of vehicles manufactured after 2000, was created to provide technicians a convenient way to access the vehicle's computer system to run diagnostic tests, monitor engine performance, and test emissions and fuel efficiency.

79. Thieves have transformed the unsecured OBD port access into a means for achieving complete control of the vehicle's computer system—*i.e.*, the engine's brain—to drive away with the vehicle.

---

[41] https://www.ruralwatchscotland.co.uk/Alerts/A/411788/Relay-Car-Theft--Protect-Your-Vehicle (last visited June 25, 2026).

**2. Electronic Software Entry**

80. Theft by "electronic software entry" occurs when thieves, armed with a laptop and sophisticated software—which can be purchased by anyone over the internet and without a background check—position themselves near a PKE-equipped Honda or Acura vehicle. Using software to emit a signal to the vehicle's PKE system, the transmitted signal covertly "awakens" the vehicle's security system and opens the vehicle to provide thieves with unfettered vehicle access. *See* Illustration C below.

Illustration C.[42]



81. Once inside, thieves proceed to plug into the OBD port to flee with the vehicle completely intact.

---

[42] https://www.newbury4x4.co.uk/range-rover-theft-prevention-in-the-uk.html (last visited June 8, 2026).

82. It typically takes a thief less than two minutes to "awaken" a PKE vehicle using "electronic software entry," plug into the OBD port, program a new key, and drive away with the vehicle.

83. This OBD port theft pathway is easier and less time-consuming in vehicles equipped with PKE because such technology reduces the number of separate barriers a thief must overcome.

**3. Rolling PWN Attacks in Honda Vehicles**

84. Honda vehicles can be unlocked by unauthorized users through the rolling code mechanism. The Rolling-PWN system vulnerability enables attacks whereby codes can be intercepted from the key fob to allow an attacker equipped with a software defined radio ("SDR") to unlock a Honda vehicle. The SDR captures a consecutive sequence of codes from a previous session and later replays them to unlock the vehicle.[43]

**4. Key Cloning**

85. Theft of Defendants' PKE-equipped vehicles can also occur through "key cloning."

86. Key cloning occurs when a thief records the VIN which is publicly visible on the lower left-hand portion of a windshield. In possession of the VIN, thieves can purchase a working coded key from a foreign entity. Again, no background check is required.

87. Once in receipt of the new key and aware of the owner's residence or vehicle location, the thief can use the cloned key to discreetly obtain vehicle access and abscond with the vehicle completely intact.

---

[43] https://www.bleepingcomputer.com/news/security/hackers-can-unlock-honda-cars-remotely-in-rolling-pwn-attacks/ (last visited October 13, 2026); https://www.vice.com/en/article/hackers-say-they-can-unlock-and-start-honda-cars-remotely/ (last visited October 28, 2026)

88. Key cloning can also occur through the use of an Autel device. An Autel is an electronic device available on the internet that can turn a blank key fob into a programmed key compatible with any vehicle.[44] The Autel can generate keys within 60 seconds, clone keys, and is compatible with multiple vehicle makes and models.[45] *See* Illustration D below.

Illustration D.[46]



**5. After Accessing the Vehicle**

89. When thieves obtain initial access and control of a Honda or Acura PKE-equipped vehicle through relay theft, electronic software entry, or key cloning theft they immediately remove the vehicle's factory-installed tracking device. Removal of the tracking device prevents Defendants and law enforcement officials from identifying the vehicle's location.

---

[44] https://local12.com/news/local/thieves-using-new-technology-steal-cars-warren-county-community-crime-spike-theft-break-in-car-vehicle-technology-keys-apartments-hotels-surveillance-dangerous-autel-scanner-black-market-selling-sold-cincinnati-ohio (last visited Oct. 28, 2026)

[45] https://www.autelkeytools.com/blogs/news/autel-maxiim-km100-vehicle-supported-list (last visited Oct. 28, 2026).

[46] https://www.locksmithkeyless.com/products/autel-maxiim-km100-universal-key-generator-kit (last visited Oct. 28, 2026).

90. Manufacturers typically install tracking devices in their vehicles in the same easily accessible location, making access and removal convenient and easy for thieves.

**6. Common Anti-Theft Solutions**

91. Relay theft, electronic software entry theft, and key cloning theft methods have become so rampant in the U.S. that many Honda and Acura vehicle owners believe there are no solutions to the problem.

92. In fact, there are common, cost-effective anti-theft technologies that could have been implemented to address the problem. One example is a Stealth Immobilizer. Stealth Immobilizers can counteract the passive keyless entry security vulnerabilities in Honda and Acura branded vehicles associated with relay theft, electronic entry theft, and key cloning theft.

93. A Stealth Immobilizer is a common anti-theft device that can prevent vehicles from starting unless a verified key code sequence is received by a transponder module that controls the engine. This anti-theft device prevents a vehicle from being "hotwired" or started by other means absent the proper key code sequence. It also prevents a vehicle from being started if a key is inadvertently left in the vehicle.

94. Stealth Immobilizers are typically installed inside the vehicle and connect to the ignition in an undetectable manner. Once installed, a Stealth Immobilizer is programmed to a combination of designated steering wheel and/or dashboard buttons. In order to turn the ignition on or place the vehicle in drive or reverse, an operator must first enter the customized sequence of codes from the steering wheel and/or dashboard buttons.

95. Once the proper code sequence has first been entered, two flashing confirmation lights will appear on the dashboard screen indicating the vehicle is ready for unencumbered use. If the proper sequence of codes is not utilized, the vehicle *will not* start and will remain immobile until the proper code is first entered. The customized

code sequence can be changed at any time by the owner or a technician, and other established codes can be used, for example, by a valet or car wash attendant.

96. The use of aftermarket Stealth Immobilizers is a proven and cost-effective method of preventing thieves from stealing Defendants' PKE-equipped vehicles.[47]

97. In the U.S., purchasers, owners, and lessees of Honda and Acura branded vehicles equipped with PKE systems are largely unaware of the security vulnerabilities of Defendants' PKE systems unless they have already had a vehicle stolen and performed post-theft due diligence.

98. Any currently existing Honda factory-installed immobilizers are inadequate because (i) they disarm when the key signal is detected; (ii) are vulnerable to relay attacks; (iii) cannot be customized or upgraded; and (iv) are overall increasingly inadequate.[48]

99. Stealth Immobilizers are an effective anti-theft technology and superior because they: (i) work independently; (ii) require separate authentication; (iii) can be customized for threat profiles; and (iv) offer remote control and monitoring capabilities. *Id*.

100. Given the low cost of Stealth Immobilizers compared to the value of the vehicle, and the catastrophic consequences of vehicle theft, it is difficult to understand why Defendants are not installing Stealth Immobilizers or any comparable operational anti-theft device that is available in the marketplace in their vehicles as part of the original equipment to counteract the theft vulnerabilities in the PKE systems. Defendants routinely spend billions of dollars annually on research and development

---

[47] Jan C. van Ours and Ben Vollaard, *The Engine Immobiliser: A Non-Starter for Car Thieves*, 126 ECON. J. 1264, 1266 (2016), https://onlinelibrary.wiley.com/doi/abs/10.1111/ecoj.12196 (last visited June 8, 2026).

[48] https://stopautotheft.ca/blogs/news/how-factory-immobilizers-work-and-how-thieves-are-bypassing-them-in-2026 (last visited Oct. 28, 2026).

and smart technology.[49] But Defendants have not provided U.S. consumers, including Plaintiff and members of the Classes, with information concerning the theft issues stemming from their PKE systems and have chosen not to provide solutions to address the vulnerabilities that plague Honda and Acura vehicles equipped with PKE systems.

**7. OBD Port Locks**

101. Another example of common anti-theft technology is an OBD port lock. Unsecured OBD ports could easily be secured by Defendants when manufacturing or selling Honda and Acura branded vehicles equipped with PKE systems through the installation of an OBD port lock. An OBD port lock is a metal cap that encases the OBD port, thereby preventing thieves from accessing and bypassing a vehicle system. A key or key code is needed before the OBD port lock can be removed. The installation of an OBD port lock is easy. Installation of most OBD port locks does not require a technician and they cost under $150.00. *See* Illustration E.

---

49 https://global.honda/en/investors/library/documents/main/00/teaserItems3/010/linkList/06/link/FY202503_form20f_e.pdf (last visited June 16, 2026); https://global.honda/en/sustainability/integratedreport/pdf/Honda_Report_2025-en-fds.pdf?utm_campaign=integratedreport2025&utm_content=Honda_Report_2025-en-fds&utm_medium=link&utm_source=top (last visited June 16, 2026)

Illustration E.




102. Honda ranks highest on brand loyalty among mass market SUV vehicle brands.[50] When one considers that for every Honda or Acura branded vehicle stolen, a brand-loyal owner or lessee may purchase or lease a new Honda or Acura branded vehicle to replace the stolen one, it is easy to understand why Defendants have turned a blind eye to the rampant theft problem in the U.S. surrounding Honda and Acura branded vehicles equipped with PKE systems.

**8. Standards In the U.S. Automobile Market**

103. In 1968, the Department of Justice ("DOJ") concluded that a substantial number of stolen vehicles cause accidents resulting in personal injuries. DOJ concluded that a reduction in vehicle theft would make a significant contribution to motor vehicle safety in the U.S. This led to the introduction of FMVSS No. 114. In 1968, the Department of Transportation ("DOT") promulgated a new Safety Standard No. 114 titled "Theft Protection; Passenger Cars," pursuant to the Safety Act. *See* 33 Fed. Reg. 6,471 (Apr. 27, 1968) ("FMVSS No. 114").

104. FMVSS No. 114 was implemented after it was "demonstrated that stolen cars constitute a major hazard to life and limb on the highways." *Id.*

---

[50] *J.D. Power 2025 Brand Loyalty Study Results*, CarPro (Oct. 2, 2025), https://www.carpro.com/blog/j.d.-power-2025-brand-loyalty-study-results.

105. As part of its evaluation of FMVSS No. 114, the DOT found that "[t]he evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals." *Id*.

106. Among the evidence used in support of this conclusion was a 1968 study conducted by the DOJ. The DOJ found that a substantially significant number of stolen vehicles would result in personal injury accidents:

> [T]here were an estimated 94,000 stolen cars involved in accidents in 1966, and more than 18,000 of these accidents resulted in injury to one or more people. On a proportionate basis, 18.2 percent of the stolen cars became involved in accidents, and 19.6 percent of the stolen-car accidents resulted in personal injury. The same study predicted that automobile thefts in 1967 total about 650,000; about 100,000 of these stolen cars could be expected to become involved in highway accidents. **Comparing these figures with statistics for vehicles which are not stolen, the approximate rate for stolen cars would be some 200 times the normal accident rate for other vehicles**. *Id*.

107. The DOJ survey found that "[t]he number of car thieves who start cars with so-called 'master keys' and devices which bypass the lock is … large enough to produce a significant safety hazard." *Id.* Accordingly, FMVSS No. 114 was explicitly designed to "defeat" this method for stealing a vehicle and requires "[a] large number of locking-system combinations and a steering or self-mobility lock." *Id.*

108. When promulgating FMVSS No. 114, the DOT rejected several comments in opposition to the Standard that argued that "since any locking system, no matter how it is constructed, can be defeated by persons possessing sufficient skill, equipment, and tenacity, provisions for ensuring removal of ignition keys would be futile because a thief need not make use of a key." *Id.* In particular, the DOT relied on the DOJ study which found that "the large majority of car thieves are amateurs, almost half of whom are engaged in so-called 'joy-riding'" and that "most" of the thieves are juveniles. *Id.*

This finding would be shown to be a prescient warning to automobile manufacturers and just as relevant fifty years later.

109. Given the dramatic increase in the accident rate caused by stolen vehicles, the DOT determined that "***a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety***. It would not only reduce the number of injuries and deaths among those who steal cars, it would also protect the many innocent members of the public who are killed and injured by stolen cars each year." *Id.* (emphasis added). Further, the DOT "concluded that a standard that would reduce the incidence of unauthorized use of cars meets the need for motor vehicle safety" and rejected the contention that the Theft Protection rules are "not related to improving motor vehicle safety." *Id.*

110. To be sure, motor vehicle theft in the United States has become a serious issue for owners, lessees, insurers as well as the general public. In 2024, a motor vehicle was stolen in the United States every thirty-six seconds. Approximately 850,000 vehicle thefts occurred in 2024.[51]

111. Vehicle theft is not merely an economic harm. Stolen vehicles are frequently driven at high speed to evade police, endangering their occupants, other motorists, and pedestrians. A study of federal Fatality Analysis Reporting System ("FARS") data found that, between 2009 and 2023, crashes involving police pursuits

---

[51] https://www.nhtsa.gov/vehicle-safety/vehicle-theft-prevention (last visited June 16, 2026).

killed 6,352 people, an average of 423 deaths per year.[52] From 1994 to 2002, more than one-third of the people killed in pursuit-related crashes were not in the fleeing vehicle.[53]

112. Stolen Honda vehicles have been involved in exactly this type of dangerous driving. In October 2024, a driver fled police in Los Angeles County for more than an hour in a stolen 2024 Honda CR-V, weaving across lanes and through a construction zone at speeds above 100 miles per hour, before losing control, striking a guardrail and an overpass on Interstate 5, and dying in the crash.[54] In April 2025, the driver of a stolen Honda CR-V that police had reportedly been following crashed into a building near Inwood Hill Park in Manhattan; the vehicle burst into flames, and the driver died at the scene.[55]

113. The danger created by the Defect is not limited to the roadway. A relay attack requires the thief to come within range of the vehicle's key fob, which for most owners means coming to the owner's home, where the fob is kept. As AAA has explained, the most common method of keyless theft is a relay attack, in which thieves use an antenna to pick up a key fob's signal even when the fob is inside the owner's

---

[52] Andrew Hendrix et al., *Police Pursuit Fatalities in the US, 2009 to 2023*, 9 JAMA Network Open e264340 (2026), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2847219.

[53] F.P. Rivara & C.D. Mack, *Motor Vehicle Crash Deaths Related to Police Pursuits in the United States*, 10 Injury Prevention 93 (2004), https://pubmed.ncbi.nlm.nih.gov/15066973/.

[54] *Authorities ID Suspect Who Died in Rollover Crash at End of High-Speed Police Chase near Gorman*, ABC7 L.A. (Oct. 25, 2024), https://abc7.com/post/authorities-identify-suspect-who-died-in-crash-at-end-of-high-speed-chase-near-gorman/15469169/.

[55] Adeja Shivonne, *NYPD Officers Suspended After Allegedly Fleeing Car Chase That Ended in Fiery Fatal Crash*, Fox 5 N.Y. (Apr. 3, 2025), https://www.fox5ny.com/news/nypd-suspended-fleeing-fiery-crash.

home.[56] In September 2026, police warned Honda owners in Virginia about a string of thefts, involving seven Honda CR-Vs and two Honda Accords, in which investigators believed thieves were using electronic devices to unlock and start the vehicles without a key; one owner's 2023 Honda CR-V was taken from outside her home in the early morning hours.[57]

114. Because relay thefts take place at owners' homes, often at night, they expose owners and their families to the risk of a confrontation with thieves. In May 2026, police in Bensalem, Pennsylvania warned that thieves targeting vehicles including Honda CR-Vs, Accords, and Civics were using relay devices to capture and amplify the signals of key fobs inside owners' homes.[58] In one theft captured on video at approximately 5:00 a.m., the owner's son, who had been getting ready for work inside the home, narrowly avoided running into the thieves.[59] Police urged residents not to approach suspects and to call 911 instead.[60]

115. Vehicle theft has increased in the U.S. as a result of auto manufacturers' adoption of PKE systems in their vehicles.

**C. Defendants' Knowledge of The Theft Crisis**

116. Defendants introduced the PKE system in at least one Acura model vehicle in or around 2005. Defendants have included this technology in more and more of their vehicles sold in the U.S. ever since.

---

[56] Kelsey Jones, *Police Warn Honda Owners After Multiple Thefts in Richmond Linked to Electronic Key Fobs*, WTVR (Sept. 29, 2026), https://www.wtvr.com/news/local-news/richmond/richmond-police-warn-honda-owners-after-multiple-thefts-in-woodland-heights-linked-to-electronic-key-fobs.

[57] *Id.*

[58] Brendan Brightman & Johnny Archer, *Bensalem Police Warn of Theft Trend Targeting High-Performance Cars*, NBC10 Phila. (May 26, 2026), https://www.nbcphiladelphia.com/news/local/bensalem-police-warn-of-theft-trend-targeting-high-performance-cars/4407827/.

[59] *Id.*

[60] *Id.*

117. The automotive industry as a whole has been aware of the security vulnerabilities in their PKE systems since at least 2011 when researchers at the University of California and University of Washington published a paper showing that keyless entry systems could be exploited to lock and unlock doors, as well as U.S. Senator Edward Markey's letters to auto manufacturers, including American Honda, in July 2022.[61] But Honda has also—for more than a decade—had specific knowledge as to the susceptibility of Honda and Acura PKE-equipped vehicles.

118. Defendants are keenly aware of the security vulnerabilities in their *own* PKE-equipped vehicles. Roughly a decade ago, Honda Motor filed and obtained a patent directed to "impeding a vehicle entry system relay attack," which expressly describes remote keyless and Smart Entry systems, including passive keyless access-and-start systems, and acknowledges that such systems can be vulnerable to malicious hacking and relay attacks.[62] Public vulnerability records have likewise identified Honda keyless-system vulnerabilities permitting relay, rollback, and resynchronization attacks, and Honda publicly acknowledged in 2022 that sophisticated tools and technical know-how could be used to mimic Remote Keyless commands and gain access to certain Honda vehicles.[63]

119. In July 2022, independent researchers publicly demonstrated that Honda vehicles from model years 2012 through 2022 could be unlocked using captured key-

---

[61] See supra ¶¶ 8–9.

[62] https://patents.google.com/patent/US9988014B2/en (last visited June 16, 2026).

[63] https://nvd.nist.gov/vuln/detail/CVE-2022-27254 (last visited June 16, 2026); https://nvd.nist.gov /vuln/detail/CVE-2022-37305 (last visited June 16, 2026); https://nvd.nist.gov/vuln/detail/CVE-2021-46145 (last visited June 16, 2026); https://techcrunch.com/2022/07/12/honda-key-fob-flaw-hackers/ (last visited June 16, 2026); https://therecord.media/honda-downplays-vulnerability-allowing-hackers-to-lock-unlock-and-start-civics (last visited June 16, 2026).

fob signals, a vulnerability catalogued as CVE-2021-46145 when it was first identified in the 2012 Honda Civic.[64]

120. In response, Honda publicly confirmed that "it is possible to employ sophisticated tools and technical know-how to mimic Remote Keyless commands and gain access to certain vehicles" of Honda's.[65] Honda also stated that the attack could not be used to drive a vehicle away, that it did not affect owners who use keyless access, and that its redesigned 2022 and 2023 model-year vehicles had improved systems.[66]

121. Those assurances did not disclose that the PKE systems in the Class Vehicles, including redesigned 2022 and later models such as Plaintiff's 2024 Civic, remained vulnerable to relay attacks and to OBD key programming, the two components of the Defect. Having spoken publicly about the security of its keyless systems in July 2022, Honda was obligated to disclose the Defect, and did not.

122. In addition, in April 2026, the U.S. Attorney for the District of Columbia obtained an indictment and brought charges against an international car theft ring that primarily targeted Honda and Acura vehicles, which are alleged to have been stolen using a key cloning device.[67]

123. Keyless entry thefts of Honda vehicles have continued since Honda's July 2022 assurances, including thefts of the redesigned 2023 and later model-year vehicles that Honda held out as improved. In February 2026, the Newark Department of Public Safety in Plaintiff's home state of New Jersey warned owners of late-model Honda

---

[64] *Some Honda Key Fobs Are Prone to Hackers*, 11Alive, https://www.11alive.com/article/money/cars/some-honda-key-fobs-prone-hackers/85-ef88a9a6-928f-4092-8544-825e320c09b9 (last visited Oct. 19, 2026).

[65] *Id.*

[66] Jonathan Greig, *Honda Redesigning Latest Vehicles to Address Key Fob Vulnerabilities*, The Record (July 13, 2022), https://therecord.media/honda-redesigning-latest-vehicles-to-address-key-fob-vulnerabilities (last visited Oct. 28, 2026).

[67] *See supra* notes 7, 9.

Accords, Civics, and CR-Vs that "[d]ue to keyless entry systems in Honda models 2023 or newer, thieves can use electronic devices to copy key fob codes, enter vehicles, and use push-to-start access to drive away."[68] Newark police advised Honda owners to protect themselves by purchasing a steering wheel lock, pedal lock, or other aftermarket vehicle security system[69]—the kind of aftermarket countermeasure Defendants have not disclosed to their customers. The vehicles subject to the Newark warning include 2024 Honda Civics such as Plaintiff's.

124. Philadelphia has experienced a sustained wave of Honda thefts in 2026. In March 2026, the Philadelphia Police Department's Major Crimes Unit began investigating a car theft ring targeting Honda vehicles throughout the city, and police reported that 747 of the more than 2,600 vehicles stolen in the city that year, or about 30%, were Hondas.[70] The thieves targeted newer Honda Accords, Civics, and CR-Vs equipped with keyless entry and push-to-start systems, and even owners who kept their key fobs in signal-blocking Faraday pouches had their vehicles stolen.[71] Philadelphia police displayed devices that thieves left behind after duplicating Honda key fobs and urged owners to buy an OBD port lock to eliminate at least one means of duplicating a

---

[68] Jen Ursillo, *High-Tech Thieves Targeting This Type of Car in Newark*, N.J. 101.5 (Feb. 13, 2026), https://nj1015.com/newark-honda-theft-warning/ (last visited Oct. 20, 2026).

[69] *Id.*

[70] *Philadelphia Police Investigating Car Theft Ring Targeting Honda Vehicles*, 6abc Phila. (Mar. 26, 2026), https://6abc.com/post/philadelphia-police-investigating-car-theft-ring-targeting-honda-vehicles/18774585/ (last visited Oct. 20, 2026).

[71] *Fairmount Honda Thefts Surge: Police Report 3 Stolen in a Week, 2600 Citywide*, FOX 29 Phila. (Mar. 24, 2026), https://www.fox29.com/news/fairmount-honda-thefts-surge-police-report-3-stolen-week-2600-citywide (last visited Oct. 20, 2026).

key fob.[72] By late July 2026, police reported that Hondas made up nearly one-quarter of the more than 8,000 vehicles stolen in Philadelphia that year.[73]

125. These thefts are ongoing. From September 20 through early October 2026, at least 21 Hondas were stolen in Richmond, Virginia, prompting the Richmond Police Department to warn Honda owners to take additional precautions; investigators believe the thieves may be exploiting the key fob's signal while the fob remains inside the owner's home.[74] One victim, whose locked Honda CR-V was stolen from outside her home, told reporters that the thieves "used some kind of remote radio detecting device to activate my keys inside my home, and then unlock and start my car."[75]

126. Thefts like these are what Honda's July 2022 assurances failed to disclose: the PKE systems in the Class Vehicles remain vulnerable to relay attacks that allow thieves to unlock, start, and drive away a vehicle while the owner's key fob sits inside the owner's home.

127. Honda disclaims responsibility for thefts, stating that "vehicle theft . . . is not unique to Honda" and that its vehicles "are equipped with state-of-the-art security features designed to deter theft and protect . . . [Honda] customers."[76] But in the same

---

[72] *More Cars Stolen Amid Recent String of Honda CRV Thefts in Philadelphia*, 6abc Phila. (July 22, 2026), https://6abc.com/amp/post/more-cars-stolen-amid-recent-string-honda-crv-thefts-philadelphia/19556983/ (last visited Oct. 20, 2026).

[73] *Nearly a Quarter of Cars Stolen in Philly So Far in 2026 Have Been Hondas: PPD*, NBC10 Phila. (July 28, 2026), https://www.nbcphiladelphia.com/news/local/nearly-a-quarter-of-cars-stolen-in-philly-so-far-in-2026-have-been-hondas-ppd/4440147/ (last visited Oct. 20, 2026).

[74] Kelsey Jones, *Richmond Police Warn Honda Owners After 21 Vehicles Stolen in Just Over 2 Weeks*, CBS 6 News Richmond (Oct. 8, 2026), https://www.wtvr.com/news/local-news/richmond/honda-thefts-oct-8-2026 (last visited Oct. 20, 2026).

[75] *Id.*

[76] *Nearly a Quarter of Cars Stolen in Philly So Far in 2026 Have Been Hondas: PPD*, *supra*, at n. 73.

article, Honda indicated that customers can choose to add "anti-theft features" themselves.[77] Defendants know that their security offerings are insufficient to prevent crime, that better protections exist to aid their customers, and chooses to change nothing.

128. For more than a decade, Defendants have not significantly changed the vehicle security systems in Honda and Acura vehicles equipped with PKE systems to address all the methods used by thieves to exploit Defendants' PKE systems to commit drive away theft. Yet, Defendants have continued to sell vehicles equipped with PKE systems.

129. Defendants have long known their PKE systems are not secure.

130. Defendants possess knowledge of the security vulnerabilities through customer complaints, as well as dealership records, warranty claims, and replacement part orders that were required to restore damage to stolen but recovered vehicles.

131. Defendants' customer service and tracking departments regularly receive and respond directly to customer calls and letters in the U.S. concerning vehicle thefts or damage to PKE-equipped vehicles that were recovered after a theft.

132. Defendants' warranty departments review warranty data submitted by U.S. dealerships and technicians to identify trends in their vehicles. Dealerships are required to provide detailed information about warranty-related claims in order to be paid for the repairs. Dealerships are subject to audits and can have payment rescinded if a complaint, cause, or correction is not fully described and documented.

133. A rise in thefts would be recorded in these documents as general customer complaints. Based on these documents and reports, Defendants knew or should have known about the PKE vulnerabilities in the U.S. as reported to Defendants and their authorized U.S. dealerships.

---

[77] *Id.*

134. Despite this knowledge, Defendants have failed to disclose to U.S. consumers the vehicle security issues posed by their PKE systems in Honda and Acura vehicles sold or leased in the U.S. that are equipped with this technology.

135. Defendants have failed to update their technology to eliminate security issues posed by PKE systems, including, for example, by disabling the vehicle's ability to reprogram keys through its OBD port.

136. Instead, Defendants demonstrated bad faith by concealing this information at the point of sale or during dealership service visits from owners and lessees in the U.S. of Honda and Acura vehicles equipped with PKE systems.

137. Vehicle theft also causes consumers' insurance premiums to increase since it is one of the factors insurance companies consider when pricing a policy. And for those who have already had one vehicle stolen, an additional theft increases the likelihood that an insurance carrier will increase a consumer's premiums or refuse to insure the consumer. The increased insurance costs are so substantial that insurance companies in Canada are beginning to sue Honda's Canadian affiliate, Honda Canada,[78] for the alleged vehicle theft endemic in their Honda and Acura-branded vehicles equipped with PKE systems.[79]

138. Consumers who purchase or lease Defendants' PKE-equipped vehicles have suffered additional damages in the form of diminished market value, and loss of the benefit of their bargain as a direct and proximate result of Defendants' material

---

[78] Denis Méthot, *Honda, Toyota and Fiat Chrysler Contest Lawsuit Filed by Two Quebec Insurers*, Ins. Portal (May 25, 2026), https://insurance-portal.ca/article/honda-toyota-and-fiat-chrysler-contest-lawsuit-filed-by-two-quebec-insurers/.

[79] https://www.insurancebusinessmag.com/ca/news/auto-motor/canadian-insurers-sue-automakers-over-alleged-vehicle-antitheft-failures-578806.aspx (last visited June 16, 2026).

misrepresentations and omissions at the point of sale, lease, and/or when vehicles are serviced at dealerships.

139. The theft of these vehicles results in a loss of market value for all vehicles equipped with the PKE system.

140. Plaintiff and members of the Classes make the following specific concealment/omission-based allegations with specificity using the information presently available:

**Who**: Defendants actively concealed and omitted facts concerning vehicle security vulnerabilities in their PKE-equipped vehicles from Plaintiff and members of the Classes while simultaneously touting the quality, safety, and dependability of such vehicles.

**What:** Defendants' PKE-equipped vehicles contain security vulnerabilities present at the point of sale as a result of the PKE systems as alleged herein. Defendants concealed and omitted these vulnerabilities from U.S. consumers and owners/lessees while simultaneously touting quality, safety, and dependability of their vehicles. Defendants knowingly sold and serviced vehicles, which were not in compliance with FMVSS 114. Vehicle theft stemming from the vulnerabilities of PKE systems is not adequately disclosed by Defendants in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' U.S. consumer facing website. And Defendants have not offered vehicle owners/lessees of Defendants' PKE-equipped vehicles the opportunity to purchase and have aftermarket Stealth

Immobilizers, or any comparable anti-theft device, installed through their affiliated dealerships.

**When:** Defendants have been aware of this issue and concealed it. To date, Defendants have not disclosed to U.S. consumers and vehicle owners and lessees of Honda and Acura PKE-equipped vehicles the truth about the full scope of the security vulnerabilities associated with this technology.

**Where**: Defendants concealed and omitted material information concerning the security vulnerabilities of PKE-equipped vehicles in every state in which they sell PKE-equipped vehicles, including California.

**How**: Defendants concealed and omitted material information concerning the PKE system vulnerabilities in communications they have had with Plaintiff and members of the Classes, including during communications regarding vehicle quality, reliability, and safety. Defendants actively concealed and omitted the truth about the existence, scope and nature of the security vulnerabilities in their PKE-equipped vehicles from Plaintiff and members of the Classes at all times. Defendants were and are keenly aware of the PKE system vulnerabilities. Defendants knew this information on the PKE system vulnerabilities was material and should have been disclosed at the point of sale or during dealership service visits. In the U.S., "[s]tolen cars constitute a major hazard to life and limb . . . [and] cause unreasonable risk of accident, personal injury and death." 33 Fed. Reg. 6,471 (Apr. 27, 1968). Knowingly selling and servicing inferior

vehicles which could be stolen and unnecessarily cause accidents by thieves in unauthorized control of Defendants' vehicles equipped with PKE systems is unconscionable.

**Why**: Defendants actively concealed and omitted material information about their vehicles' PKE system vulnerabilities for the purpose of preserving the reputation, image, marketability, resale value, and profitability of Honda and Acura vehicles and to avoid the cost and reputational harm associated with disclosure, repair, replacement, recall, or other corrective action. Had Defendants disclosed the truth in their advertisements, sales material or other communications, Plaintiff and Class Members would have been aware of the issue, negotiated a lower price or demanded that American Honda correct this problem, bought or leased another brand vehicle, or installed an aftermarket anti-theft device, such as a Stealth Immobilizer.

## TRADE AND COMMERCE

141. During the Class Period (defined below), Defendants manufactured, marketed, distributed, sold, and/or leased new Honda and Acura branded vehicles with PKE systems in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, its territories, and the District of Columbia.

142. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of Honda and Acura branded vehicles transmitted interstate between and among Defendants' offices and from Defendants to their U.S. dealers throughout the United States.

143. Throughout the Class Period, Defendants transported or arranged for the transportation of substantial numbers of Honda and Acura branded vehicles in a continuous and uninterrupted flow of interstate commerce throughout the United States.

144. Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

## **CALIFORNIA LAW APPLIES NATIONWIDE TO THE CLAIMS IN THIS LITIGATION**

145. California law applies to Plaintiff's nationwide claims because Plaintiff's injuries emanated from American Honda's headquarters in California. Each pertinent decision to conceal information concerning the vehicles' passive keyless entry system vulnerabilities from Class members, including marketing, sales, commercial distribution, and warranties was made from American Honda's California headquarters by its respective executives and employees located in California.

146. The theft of Honda and Acura branded vehicles equipped with PKE systems should have been remediated long ago through the development of more advanced secure systems. But Defendants have buried their heads in the sand and refused to inform U.S. consumers of the security risks posed by the passive keyless entry systems in Defendants' PKE-equipped vehicles and to redesign/upgrade their vehicles' PKE systems to address the various types of electronic theft and key cloning which is occurring.

## **INJURY AND THREATENED INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS**

147. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Classes have been deceived and financially injured. As Defendants' unlawful conduct is ongoing, Plaintiff, members of the Classes, and the consuming public are threatened with similar injuries in the future.

## CLASS ACTION ALLEGATIONS

148. Plaintiff brings this action on her own behalf and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Classes:

**The Damages Class:**

All persons or entities that purchased, other than for immediate resale, or leased a Honda or Acura vehicle with a passive keyless entry system from an authorized Honda or Acura dealer in the United States, its territories, or the District of Columbia from January 1, 2015, to the present ("Class Period").

**The Injunctive Relief Class**:

All persons or entities in the United States, its territories, or the District of Columbia that presently own or lease a Honda or Acura vehicle with a passive keyless entry system that was purchased or leased from January 1, 2015, to the present ("Class Period").

149. Excluded from the Classes are: (i) Defendants, their affiliates, employees, officers, and directors; (ii) persons or entities that purchased or leased a vehicle for resale; and (iii) Judge(s) or their staff assigned to this case. Plaintiff reserves the right to modify, change or expand the definition of the Classes for any reason.

150. Plaintiff and members of the Damages Class seek damages for those members of that class who were harmed by Defendants' unlawful conduct in the United States.

151. Plaintiff does not know the exact number of members in the Classes, because such information is in the exclusive control of Defendants and their dealers. Due to the nature of the trade and commerce involved, however, Plaintiff believes that members of each Class are in the hundreds of thousands in the United States, and in any event, are sufficiently numerous and geographically dispersed throughout the United States such that joinder of all members of each Class is impracticable.

152. Except as to the amount of damages each member of the Damages Class has incurred, all other questions of law or fact are common to the Classes, including, but not limited to:

a. Whether Defendants failed to inform consumers, owners and/or lessees of the security vulnerabilities stemming from PKE systems in vehicles sold in the U.S. during the Class Period;

b. Whether Defendants breached their contractual obligations to Plaintiff and members of the Classes when selling or leasing PKE-equipped vehicles in the U.S. during the Class Period with security vulnerabilities known to Defendants stemming from their PKE systems;

c. Whether Defendants violated the law when selling Honda and Acura PKE-equipped vehicles in the U.S. during the Class Period with security vulnerabilities known to Defendants stemming from their PKE systems;

d. Whether Defendants were unjustly enriched when selling Honda and Acura PKE-equipped vehicles in the U.S. during the Class Period with security vulnerabilities known to Defendants stemming from their PKE systems;

e. The duration and extent of the unlawful conduct alleged in this Complaint;

f. The appropriate measure of damages sustained by Plaintiff and members of the Damages Class; and

g. Whether injunctive relief is an appropriate remedy.

153. Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the members of the Classes.

154. Plaintiff is typical and Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Classes.

155. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of automobile and consumer protection class action litigation.

156. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

157. The questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages, and restitution.

158. A class action is superior to other methods for the fair and efficient adjudication of this controversy.

159. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

160. Class treatment will also permit the adjudication of claims by many members of the Classes who could not afford to individually litigate the claims asserted in this Complaint. This Class action presents no difficulties in management that would preclude maintenance as a class action.

161. Membership in the Classes is readily ascertainable directly from Defendants' and/or dealers' records.

**Tolling the Statute of Limitations**

162. Any statute of limitations has been tolled by Defendants' knowing and active concealment and/or denial of the facts alleged herein. Plaintiff and members of the Classes could not have reasonably discovered the true nature of the passive keyless entry system vulnerabilities in the vehicles because Defendants concealed them. The claims of Plaintiff and members of the Classes were tolled pursuant to: (i) the discovery

rule; (ii) the fraudulent concealment rule; (iii) the continuing violation rule; and (iv) the law of estoppel.

**1. Discovery Rule**

163. The causes of action alleged herein did not accrue until Plaintiff and members of the Classes discovered that their PKE-equipped Acura or Honda vehicles contained security vulnerabilities as a result of Defendants' PKE systems.

164. Plaintiff and members of the Classes had no way of knowing about the passive keyless entry security vulnerabilities because Defendants concealed their knowledge of the information from Plaintiff and members of the Classes when selling, leasing, and/or servicing PKE-equipped vehicles. To this day, Defendants have failed to disclose the extent to which the security vulnerabilities exist in Honda and Acura PKE-equipped vehicles in the U.S.

165. Within the applicable statutes of limitations, Plaintiff and members of the Classes could not have discovered through the exercise of reasonable diligence that Defendants were concealing material information and misrepresenting the true qualities of the vehicles.

166. Members of the Classes did not know facts that would have caused a reasonable person to suspect there are security vulnerabilities in Defendants' PKE-equipped vehicles as a result of their PKE systems. An ordinary person would be unable to appreciate that the PKE system was inferior, especially because Defendants marketed such technology in its most expensive and/or luxurious trims. Members of the Classes who owned or leased a vehicle that was stolen as an ordinary consumer without sophisticated knowledge of the mechanical systems, security features and anti-theft devices would not and could not have known or suspected that the vehicle was susceptible to being, or was, stolen as a result of PKE-related vehicle vulnerabilities. This is because Defendants withheld this information from U.S. consumers and owners and lessees in the U.S. of Defendants' vehicles equipped with PKE technology.

167. For these reasons, all applicable statutes of limitations have been tolled by the operation of the discovery rule with respect to the claims in this litigation.

**2. Fraudulent Concealment**

168. As the manufacturer, seller, or warrantor of Honda and Acura vehicles in the U.S., Defendants were under a continuing duty to disclose to members of the Classes the existence of the vehicle vulnerabilities in all Defendants' vehicles equipped with a PKE system.

169. Defendants were and remain under a continuing duty to disclose to Plaintiff and members of the Classes the true character, quality and nature of the vehicle vulnerabilities found in Honda and Acura vehicles sold in the U.S. with unsecure PKE systems which allow thieves to easily steal vehicles in under two minutes. This vehicle PKE vulnerability decreases the value of the vehicles at the point of sale, results in expensive repairs or replacement costs, poses serious safety concerns, causes damage to personal property, and causes a sharp increase in insurance premiums.

170. Rather than publicly disclose the PKE vulnerabilities to U.S. consumers and update their security system in PKE-equipped vehicles, Defendants kept—and continue to keep—U.S. owners and lessees of such vehicles in the dark while continuing to sell new vehicles equipped with PKE systems absent disclosure of the security issues. This was a fraudulent, unfair, deceptive, and unconscionable commercial trade practice.

171. Members of the Classes were not at fault for failing to discover the existence of the Defendants' PKE-equipped vehicles' vulnerabilities given Defendants' superior knowledge and active concealment.

**3. Continuing Violation of Law**

172. Defendants are continuing to knowingly sell vehicles with unsecure PKE systems.

173. Accordingly, Defendants are engaged in a continuing violation of law as alleged herein and the statute of limitations has not run.

**4. Estoppel**

174. Defendants were, and are, under a continuous duty to disclose to Plaintiff and members of the Classes the true character, quality, and nature of their vehicles, because they actively make representations to U.S. consumers. Defendants failed to disclose the existence of security vulnerabilities in their PKE-equipped vehicles while knowingly making representations about their true character, quality, and nature. Defendants actively concealed the facts surrounding the security vulnerabilities of their PKE-equipped vehicles. Based on the foregoing, each Defendant is estopped from relying on the statute of limitations as a defense in this action.

**FIRST CLAIM FOR RELIEF**

**Violation of California Consumers Legal Remedies Act**

***Omission / Concealment***

175. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 174 as though set forth herein.

176. Defendants are "persons" within the meaning of California Civil Code section 1761(c), and Plaintiff and members of the Classes are "consumers" within the meaning of California Civil Code section 1761(d).

177. The Honda and Acura vehicles at issue are "goods" within the meaning of California Civil Code section 1761(a), and the purchase and lease of those vehicles constituted transactions intended to result, and which did result, in the sale or lease of goods to consumers.

178. Defendants violated the CLRA, including California Civil Code sections 1770(a)(5), 1770(a)(7), and 1770(a)(9), by representing, advertising, marketing, selling, and leasing Honda and Acura PKE-equipped vehicles as safe, secure, reliable, technologically advanced, and suitable for ordinary consumer use while omitting and concealing material facts concerning security vulnerabilities stemming from the vehicles' PKE systems.

179. When advertising, marketing, selling, leasing, and warranting the Honda and Acura PKE-equipped vehicles, Defendants knew, or were aware of facts showing, that the vehicles contained security vulnerabilities.

180. Defendants were also aware that ordinary consumers, purchasers, owners, and lessees could not reasonably have been expected to know of these vulnerabilities before purchase or lease because the vulnerabilities concerned technical vehicle-security architecture, keyless-entry and keyless-start communications, immobilizer authorization, electronic control modules, key-programming functionality, service information, warranty information, theft-risk information, and other information uniquely within Defendants' possession or control.

181. Defendants had a duty to disclose the PKE vulnerabilities to Plaintiff and members of the Classes before purchase or lease. That duty arose because Defendants: (i) possessed exclusive or superior knowledge of material facts not known or reasonably accessible to Plaintiff and members of the Classes; (ii) actively concealed the vulnerabilities and their consequences; (iii) made partial representations regarding the safety, security, reliability, quality, technological sophistication, and ordinary usability of the vehicles while suppressing material qualifying facts; and (iv) the omitted facts concerned vehicle security, safety, reliability, theft risk, and the value of a major consumer purchase.

182. Defendants had access to, and far superior knowledge of, the PKE vulnerabilities and their consequences. Defendants also had access to internal engineering, warranty, service, technical, customer-complaint, theft, law-enforcement, insurance, dealer, and other information regarding the vulnerabilities and the risk that unauthorized persons could exploit the affected systems to access, start, program keys to, or steal affected vehicles.

183. Defendants made incomplete and misleading representations about the safety, security, reliability, quality, technological sophistication, and ordinary usability of Honda and Acura PKE-equipped vehicles while withholding material facts

concerning the security vulnerabilities. Because Defendants chose to speak about such vehicles' safety, security, keyless-entry features, keyless-start features, reliability, quality, and suitability for ordinary use, Defendants had a duty to disclose the whole truth and not omit material facts necessary to make their representations not misleading.

184. Defendants failed to disclose the PKE vulnerabilities in their advertising, marketing materials, Monroney labels—*i.e.*, window stickers—websites, owner communications, owner's manuals, warranty materials, dealership sales materials, point-of-sale disclosures, lease materials, and dealership service communications.

185. Defendants actively concealed and suppressed material information to preserve the reputation, image, marketability, resale value, and profitability of Honda and Acura vehicles and to avoid the cost and reputational harm associated with disclosure, repair, replacement, recall, or other corrective action.

186. Defendants' omissions and misrepresentations were material to Plaintiff and members of the Classes and would be material to a reasonable consumer. Vehicle security, theft resistance, the risk of unauthorized electronic access, the risk that a vehicle may be started, entered, moved, or stolen through electronic exploitation of its keyless-entry or keyless-start architecture, and the absence of an effective factory remedy are facts that reasonable consumers would consider important in deciding whether to purchase or lease a vehicle and how much to pay for it.

187. Defendants marketed, distributed, priced, and sold the PKE-equipped vehicles through uniform, centralized, and controlled channels, including standardized vehicle specifications, Monroney/window-sticker information, owner-facing materials, Honda and Acura websites, brochures, dealer-facing sales and technical materials, authorized Honda and Acura dealerships, warranty materials, and other pre-sale and point-of-sale communications concerning the characteristics, benefits, quality, safety, security, and reliability of the Defendants' PKE-equipped vehicles. Defendants had the

ability and duty to disclose the omitted security-related facts through these uniform channels before purchase or lease.

188. Defendants did not disclose the PKE vulnerabilities, the associated theft and unauthorized-access risks, or the absence of an effective factory remedy through any uniform pre-sale or point-of-sale disclosure. Had Defendants disclosed those facts through the same uniform channels by which they marketed, priced, distributed, and sold their PKE-equipped vehicles, the information would have reached the market and reasonable consumers, including Plaintiff and members of the Classes, before purchase or lease.

189. Because the omitted facts were material to a reasonable consumer and were uniformly withheld from Defendants' standardized pre-sale and point-of-sale disclosure channels, Plaintiff and members of the Classes were exposed to the same material omission.

190. As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and members of the Classes suffered actual damages, including overpayment, diminished vehicle value, loss of the benefit of the bargain, and other economic injury in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

### (*American Honda Only*)

191. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 190 as though set forth herein.

192. American Honda issued, administered, and/or was obligated under the written warranties covering PKE-equipped vehicles purchased, owned, or leased by Plaintiff and members of the Classes. The Honda Automobile Division, a division of American Honda, gives those warranties on behalf of American Honda.

193. Under the New Vehicle Limited Warranty, American Honda promised that Plaintiff's vehicle would be covered against defects in materials and workmanship

during the warranty period and that covered defects would be repaired or corrected through Defendants' authorized dealer network.

194. The PKE system involves a complex interplay between various hardware components—including the vehicle's body control module, powertrain control module, various antennae, receivers and transceivers, the ignition switch, and the engine immobilizer—such that in-person servicing is required to remedy or repair system defects.[80]

195. Plaintiff performed all obligations required of her under the warranty, or her performance was excused.

196. American Honda breached its warranty contract by, among other things, failing to disclose the existence, nature, and scope of the security vulnerabilities of Honda and Acura PKE-equipped vehicles; failing to disclose and provide an effective warranty repair, software update, service procedure, or other countermeasure for the defect; failing to advise Plaintiff and members of the Classes that their vehicles contained PKE vulnerabilities affecting the safety, security, reliability, and value of the vehicles; and administering its warranty obligations in a manner that deprived Plaintiff and members of the Classes of the benefit of the warranty coverage for which they paid.

197. As a direct and proximate result of American Honda's breach of contract, Plaintiff and members of the Classes were deprived of the benefits of their warranty, overpaid for their vehicles, suffered diminution in vehicle value, incurred out-of-pocket costs, and sustained other damages in an amount to be proven at trial.

---

[80] https://actgroup.ir/keyless-entry-systems-in-cars/ (last visited Oct. 28, 2026).

## THIRD CLAIM FOR RELIEF

**Breach of Express Warranty**

**(*American Honda Only*)**

198. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 197 as though fully set forth herein.

199. American Honda is and was at all relevant times a merchant of Honda and Acura motor vehicles under California law because it regularly dealt in, distributed, warranted, marketed, and held itself out as having knowledge or skill peculiar to such motor vehicles. *See* Cal. Com. Code § 2104(1).

200. American Honda is and was at all relevant times the distributor and express warrantor of Honda and Acura branded motor vehicles sold or leased in California, New Jersey, and throughout the United States through authorized Honda and Acura dealers, including Plaintiff's PKE-equipped 2024 Honda Civic Sport.

201. To the extent American Honda sold, contracted to sell, supplied, distributed, or placed Honda and Acura PKE-equipped vehicles into the stream of commerce through its authorized dealer network, American Honda was a "seller" of such vehicles within the meaning of California Commercial Code § 2103(1)(d).

202. All members of the Classes who purchased Defendants' PKE-equipped vehicles during the Class Period were "buyers" within the meaning of California Commercial Code § 2103(1)(a).

203. All members of the Classes who leased Defendants' PKE-equipped vehicles during the Class Period were "lessees" within the meaning of California Commercial Code § 10103(a)(14).

204. Defendants' PKE-equipped vehicles sold or leased to Plaintiff and members of the Classes during the Class Period were at all relevant times "goods" under California law. *See* Cal. Com. Code §§ 2105(1) and 10103(a)(8).

205. In connection with each Honda and Acura PKE-equipped vehicle sold or leased to Plaintiff and members of the Classes during the Class Period, American

Honda provided Plaintiff and members of the Classes with one or more express warranties, including the Honda and Acura new vehicle limited warranties.

206. Under American Honda's express warranties, American Honda promised to repair or replace, at no cost to owners and lessees, covered flaws in materials or workmanship affecting Honda and Acura vehicles during the applicable warranty period.

207. American Honda's express warranties applied to vehicles purchased, owned, or leased by Plaintiff and members of the Classes, including the vehicles' factory-installed electronic, access, ignition, immobilizer, body-control, keyless-entry, keyless-start, anti-theft, and related security systems and components.

208. American Honda also made affirmations of fact, promises, descriptions, and representations concerning the characteristics, quality, reliability, safety, security, and functionality of Honda and Acura vehicles equipped with PKE systems, including representations concerning their keyless-entry, push-button-start, immobilizer, anti-theft, and related vehicle-security capabilities and features.

209. American Honda's express warranties, affirmations, promises, descriptions, and representations became part of the basis of the bargain reached when Plaintiff and members of the Classes purchased or leased their Honda and Acura PKE-equipped vehicles during the Class Period.

210. At all relevant times, the Honda and Acura vehicles sold or leased to Plaintiff and members of the Classes contained security vulnerabilities stemming from the PKE systems contained in those vehicles, as alleged herein.

211. These PKE vulnerabilities substantially impaired the safety, security, reliability, and value of the vehicles and rendered them more susceptible to unauthorized access, unauthorized starting, key programming, theft, attempted theft, vandalism, and other criminal misuse.

212. American Honda breached its express warranties by representing that it would repair or remedy covered flaws in materials or workmanship while failing and

refusing to provide an effective repair, replacement, software update, service procedure, notice, or other remedy for the PKE vulnerabilities.

213. American Honda further breached its express warranties by selling or leasing, through its authorized dealer network, Honda and Acura PKE-equipped vehicles that did not conform to American Honda's express affirmations, promises, descriptions, and representations concerning the vehicles' quality, reliability, safety, security, and vehicle-security systems.

214. The PKE vulnerabilities alleged herein existed at the time of sale or lease of each of Defendants' vehicles equipped with PKE systems and arose from, affected, and/or manifested in factory-installed materials, workmanship, components, software, modules, key fobs, immobilizer systems, electronic access systems, body-control systems, and related vehicle-security systems.

215. Any attempt by American Honda to disclaim, limit, or restrict the express warranties applicable to the Defendants' vehicles equipped with PKE systems is unconscionable, unenforceable, and/or fails of its essential purpose under the circumstances.

216. American Honda's warranty limitations are unenforceable because American Honda knowingly sold or leased, through its authorized dealer network, vehicles containing the PKE related security vulnerabilities without informing consumers about the nature and scope of the PKE vulnerabilities or providing a meaningful repair or mitigation program.

217. The time and mileage limitations contained in American Honda's warranties are also unconscionable and inadequate to protect Plaintiff and members of the Classes because American Honda knew or should have known that the PKE vulnerabilities existed at the time of sale or lease, concealed the vulnerabilities from Plaintiff and members of the Classes, and failed to disclose facts necessary for Plaintiff and members of the Classes to discover and assert their warranty rights within the stated warranty period.

218. Plaintiff and members of the Classes had no meaningful choice in determining American Honda's warranty limitations, the terms of which unreasonably favored American Honda and were imposed despite American Honda's superior and exclusive knowledge concerning the security vulnerabilities alleged herein.

219. A gross disparity in bargaining power existed between American Honda and Plaintiff and members of the Classes because American Honda possessed superior knowledge concerning the design, manufacture, operation, vulnerabilities, and available countermeasures for the vehicle-security vulnerabilities, while Plaintiff and members of the Classes could not reasonably have discovered the defect before purchase or lease.

220. American Honda has known for years of PKE related security vulnerabilities affecting Honda and Acura PKE-equipped vehicles sold or leased in the United States, but has not instituted meaningful notice to consumers or provided a meaningful warranty repair or mitigation program.

221. Plaintiff and members of the Classes provided American Honda with notice of Defendant's breaches of express and implied warranties pursuant to California Civil Code § 1782(a)(2) through a letter dated July 15, 2026.

222. As a direct and proximate result of American Honda's breaches of express warranties, Plaintiff and members of the Classes have been injured in an amount to be proven at trial, including overpayment, diminution in value, loss of warranty benefits, out-of-pocket costs, repair or mitigation costs, and other incidental and consequential damages.

## FOURTH CLAIM FOR RELIEF

### Breach of Implied Warranty of Merchantability

### (*American Honda Only*)

223. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 222 as though set forth herein.

224. A warranty that the Defendants' PKE-equipped vehicles were in merchantable condition and fit for the ordinary purposes for which such goods are used is implied and arises by operation of law under California Commercial Code §§ 2314 and 10212 and California Civil Code §§ 1791.1 and 1792.

225. American Honda is and was at all relevant times a merchant of Honda and Acura vehicles under California law because it regularly dealt in, distributed, warranted, marketed, and held itself out as having knowledge or skill peculiar to such vehicles. *See* Cal. Com. Code § 2104(1).

226. American Honda is and was at all relevant times the distributor, manufacturer, and/or warrantor of Honda and Acura motor vehicles sold or leased in the U.S. through authorized Honda and Acura automobile dealers, including Plaintiff's PKE-equipped 2024 Honda Civic Sport.

227. To the extent American Honda sold, contracted to sell, supplied, distributed, or placed Honda and Acura PKE-equipped vehicles into the stream of commerce through its authorized dealer network, American Honda was a "seller" of such vehicles within the meaning of California Commercial Code § 2103(1)(d).

228. To the extent American Honda leased, supplied, distributed, warranted, or participated in lease transactions involving Honda and Acura PKE-equipped vehicles through its authorized dealer network or related financing entities, American Honda was a "lessor," supplier, distributor, manufacturer, and/or warrantor of such vehicles under California law.

229. All members of the Classes who purchased Honda and Acura PKE-equipped vehicles during the Class Period were "buyers" within the meaning of California Commercial Code § 2103(1)(a) and/or retail buyers under California consumer-warranty law.

230. All members of the Classes who leased Honda and Acura PKE-equipped vehicles during the Class Period were lessees under California law.

231. The Honda and Acura PKE-equipped vehicles sold or leased to Plaintiff and members of the Classes during the Class Period were at all relevant times "goods" under California Commercial Code §§ 2105(1) and 10103(a)(8), and "consumer goods" under California Civil Code § 1791.

232. Under California law, an implied warranty of merchantability means that goods to be sold or leased must at least: (1) pass without objection in the trade under the contract description or lease agreement; (2) be fit for the ordinary purposes for which such goods are used; (3) be adequately contained, packaged, and labeled; and (4) conform to the promises or affirmations of fact made on the container or label.

233. American Honda impliedly warranted to Plaintiff and members of the Classes that Defendants' PKE-equipped vehicles were merchantable and fit for the ordinary purposes for which passenger motor vehicles are used.

234. At all relevant times, American Honda knew or had reason to know that Plaintiff and members of the Classes purchased or leased Defendants' PKE-equipped vehicles for the ordinary purpose of providing reasonably safe, reliable, and secure transportation.

235. American Honda provided Plaintiff and members of the Classes with an implied warranty that Defendants' PKE-equipped vehicles, and their factory-installed parts, components, software, modules, systems, and vehicle-security features, were merchantable and fit for the ordinary purposes for which they were sold or leased.

236. The implied warranty included, among other things, a warranty that Defendants' PKE-equipped vehicles were manufactured, supplied, distributed, warranted, sold, and leased for the provision of reasonably safe, reliable, and secure transportation, and that the vehicles' PKE systems were reasonably fit for their ordinary purposes.

237. At all relevant times, Defendants' PKE-equipped vehicles did not comply with the implied warranty of merchantability because they were not in merchantable

condition and were not fit for their ordinary purpose of providing reasonably safe, reliable, and secure transportation at the time of sale or lease, or thereafter.

238. Defendants' PKE-equipped vehicles were not merchantable because they contained PKE related security vulnerabilities that rendered them susceptible to unauthorized access, unauthorized starting, key programming, theft, attempted theft, vandalism, and other criminal misuse.

239. The Class Vehicles fail at a core function. A vehicle's door locks, ignition authorization, and immobilizer exist so that only persons who possess the vehicle's key can enter and start it. Because of the Defect, the Class Vehicles' authorization systems grant entry, and permit the engine to be started, for persons who do not possess the key. A vehicle whose locks and ignition authorization do not perform that function lacks the minimum level of quality of a passenger vehicle, even if it otherwise provides transportation. The failure also creates a safety hazard: stolen vehicles are involved in accidents at many times the rate of other vehicles, as alleged above, and relay theft requires thieves to come to the owner's home, where the key fob is kept.

240. These PKE vulnerabilities substantially impaired the safety, security, reliability, and value of Defendants' PKE-equipped vehicles and exposed Plaintiff and members of the Classes to risks, costs, and losses that reasonable consumers would not expect in vehicles marketed, sold, leased, and warranted as safe, reliable, secure, and technologically advanced passenger vehicles.

241. Defendants' PKE-equipped vehicles would not pass without objection in the trade under the contract description because vehicles containing undisclosed security vulnerabilities are not merchantable passenger vehicles.

242. Defendants' PKE-equipped vehicles also failed to conform to American Honda's promises, affirmations of fact, descriptions, labeling, and representations concerning the vehicles' quality, safety, reliability, security, anti-theft protection, and ordinary transportation functionality.

243. Any attempt by American Honda to disclaim, limit, or restrict the implied warranty of merchantability for Defendants' PKE-equipped vehicles is unconscionable, unenforceable, and/or ineffective.

244. American Honda's warranty limitations are unenforceable because American Honda knowingly sold, leased, distributed, and warranted Defendants' PKE-equipped vehicles without informing consumers about the nature, scope, and consequences of the security vulnerabilities stemming from the passive keyless entry system.

245. The time and mileage limitations contained in American Honda's warranties are also unconscionable and inadequate to protect Plaintiff and members of the Classes because American Honda knew or should have known that the security vulnerabilities related to their PKE-systems existed at the time of sale or lease, concealed the vulnerability from Plaintiff and members of the Classes, and failed to disclose facts necessary for Plaintiff and members of the Classes to discover and assert their warranty rights within the stated warranty period.

246. Plaintiff and members of the Classes had no meaningful choice in determining American Honda's warranty limitations, the terms of which were never fully disclosed in light of the risks surrounding Defendants' PKE-equipped vehicles and which unreasonably favored American Honda.

247. A gross disparity in bargaining power existed between American Honda and Plaintiff and members of the Classes because American Honda possessed superior and exclusive knowledge concerning the design, manufacture, operation, vulnerabilities, and available countermeasures for the PKE-systems installed in the vehicles purchased by Plaintiff and members of the Classes, while Plaintiff and members of the Classes could not reasonably have discovered the PKE security vulnerabilities before purchase or lease of the vehicle.

248. American Honda has known for years of security vulnerabilities affecting Defendants' PKE-equipped vehicles sold or leased in the United States but has not

instituted meaningful notice to consumers or provided a meaningful repair or mitigation program.

249. Plaintiff and members of the Classes provided American Honda with notice of the breach, and, notwithstanding this fact, American Honda had actual knowledge of the PKE vulnerabilities, knew that Defendants' PKE-equipped vehicles were inferior and unmerchantable, and nevertheless failed to provide an effective repair, replacement, or remedy.

250. As a direct and proximate result of American Honda's breach of the implied warranty of merchantability, Plaintiff and members of the Classes have been injured in an amount to be proven at trial, including overpayment, diminution in value, loss of warranty benefits, out-of-pocket costs, repair or mitigation costs, and other incidental and consequential damages.

## FIFTH CLAIM FOR RELIEF

### Defendants' Violations of State Warranty Statutes

251. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 250 as though set forth herein.

252. Defendants knew or had reason to know of the transportation use for which Defendants' PKE-equipped vehicles were purchased or leased. Defendants provided Plaintiff and members of the Classes with an implied warranty that their vehicles, and any parts thereof, were merchantable and fit for the ordinary purpose for which they were sold. The implied warranty included, among other things, a warranty that Defendants' PKE-equipped vehicles were manufactured, supplied, distributed, and sold by Defendants for the provision of safe and reliable transportation in the U.S. and they were not vulnerable to theft.

253. Defendants' PKE-equipped vehicles did not comply with the implied warranty of merchantability because they were not in merchantable condition, were not fit for their ordinary purpose of providing reasonably reliable, safe, and secure transportation at the time of sale or thereafter because Defendants' PKE-equipped

vehicles contained passive keyless entry systems with security vulnerabilities making them prime targets for theft, reckless driving, and other criminal activity to the financial detriment of Plaintiff, members of the Classes, and the public.

254. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability for Defendants' PKE-equipped vehicles is unconscionable and unenforceable under the circumstances. Defendants' warranty limitations are unenforceable because they knowingly sold or leased vehicles with inferior security systems without informing U.S. customers about security vulnerabilities stemming from the PKE system in Defendants' PKE-equipped vehicles. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Classes. Plaintiff and members of the Classes had no meaningful choice in determining these limitations, the terms of which were never fully disclosed based upon the risks surrounding the vehicles and the terms of which, therefore, unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiff and members of the Classes because the Defendants were fully aware of PKE-equipped vehicle vulnerabilities and failed to disclose the information to Plaintiff and members of the Classes.

255. The circumstances described herein have caused Defendants' exclusive or limited remedy to fail its essential purpose such that Plaintiff and members of the Classes may seek alternative remedies. The breaches of warranties have denied Plaintiff and members of the Classes the benefit of their respective bargains which presupposes that their vehicles were equipped with a secure passive keyless entry system.

256. Defendants have known for over ten years of Defendants' PKE-equipped vehicle vulnerabilities but have not instituted adequate and meaningful notice to U.S. consumers, owners or lessees nor provide meaningful remedies with respect to Defendants' PKE-equipped vehicles sold in the U.S. during the Class Period.

257. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Defendants' PKE-equipped vehicles owned, purchased, or leased by Plaintiff and members of the Classes were and are inferior and have not been remedied.

258. Plaintiff and members of the Classes have been injured in an amount to be proven at trial.

259. By engaging in the foregoing conduct, Defendants have violated the following Implied Warranty of Merchantability state statutes:

a. Defendants have breached the implied warranty of merchantability in violation of Ala. Code §§ 7-2-314 and 7-2A-212 et seq.

b. Defendants have breached the implied warranty of merchantability in violation of Alaska Stat. Ann. §§ 45.02.314 and 45.12.212 et seq.

c. Defendants have breached the implied warranty of merchantability in violation of Ariz. Rev. Stat. §§ 47-2314 and 47-2A-212 et seq.

d. Defendants have breached the implied warranty of merchantability in violation of Ark. Code Ann. §§ 4-2-314 and 4-2A-212 et seq.

e. Defendants have breached the implied warranty of merchantability in violation of Cal. Com. Code §§ 2314 and 10212 et seq.

f. Defendants have breached the implied warranty of merchantability in violation of Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212 et seq.

g. Defendants have breached the implied warranty of merchantability in violation of Conn. Gen. Stat. Ann. §§ 42a-2-314 and 42a-2A-212 et seq.

h. Defendants have breached the implied warranty of merchantability in violation of D.C. Code §§ 28:2-314 and 28:2A-212 et seq.

i. Defendants have breached the implied warranty of merchantability in violation of 6 Del. Code §§ 2-314 and 2A-212 et seq.

j. Defendants have breached the implied warranty of merchantability in violation of Fla. Stat. §§ 672.314 and 680.212 et seq.

k. Defendants have breached the implied warranty of merchantability in violation of Ga. Code Ann. §§ 11-2-314 and 11-2A-212 et seq.

l. Defendants have breached the implied warranty of merchantability in violation of Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212 et seq.

m. Defendants have breached the implied warranty of merchantability in violation of Idaho Code Ann. §§ 28-2-314 and 28-12-212 et seq.

n. Defendants have breached the implied warranty of merchantability in violation of 815 Ill. Comp. Stat. Ann. §§ 5/2-314 and 5/2A-212 et seq.

o. Defendants have breached the implied warranty of merchantability in violation of Ind. Code §§ 26-1-2-314 and 26-1-2.1-212 et seq.

p. Defendants have breached the implied warranty of merchantability in violation of Iowa Code §§ 554.2314 and 554.13212 et seq.

q. Defendants have breached the implied warranty of merchantability in violation of Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212 et seq.

r. Defendants have breached the implied warranty of merchantability in violation of Ky. Rev. Stat. §§ 355.2-314 and 355.2A-212 et seq.

s. Defendants have breached the implied warranty of merchantability in violation of La. Civ. Code §§ 2520, 2524 et seq.

t. Defendants have breached the implied warranty of merchantability in violation of Me. Rev. Stat. tit. 11 §§ 2-314 and 2-1212 et seq.

u. Defendants have breached the implied warranty of merchantability in violation of Md. Code Com. Law §§ 2-314 and 2A-212 et seq.

v. Defendants have breached the implied warranty of merchantability in violation of Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212 et seq.

w. Defendants have breached the implied warranty of merchantability in violation of Mich. Comp. Laws Ann. §§ 440.2314 and 440.2862 et seq.

x. Defendants have breached the implied warranty of merchantability in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212 et seq.

y. Defendants have breached the implied warranty of merchantability in violation of Miss. Code Ann. §§ 75-2-314 and 75-2A-212 et seq.

z. Defendants have breached the implied warranty of merchantability in violation of Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212 et seq.

aa. Defendants have breached the implied warranty of merchantability in violation of Mont. Code Ann. §§ 30-2-314 and 30-2A-212 et seq.

bb. Defendants have breached the implied warranty of merchantability in violation of Neb. Rev. Stat. §§ 2-314 and 2A-212 et seq.

cc. Defendants have breached the implied warranty of merchantability in violation of Nev. Rev. Stat. §§ 104.2314 and 104A.2212 et seq.

dd. Defendants have breached the implied warranty of merchantability in violation of N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 2A-212 et seq.

ee. Defendants have breached the implied warranty of merchantability in violation of N.J. Stat. Ann. §§ 12A:2-314 and 12A:2A-212 et seq.

ff. Defendants have breached the implied warranty of merchantability in violation of N.M. Stat. Ann. §§ 55-2-314 and 55-2A-212 et seq.

gg. Defendants have breached the implied warranty of merchantability in violation of N.Y. U.C.C. Law §§ 2-314 *et* seq.

hh. Defendants have breached the implied warranty of merchantability in violation of N.C. Gen. Stat. §§ 25-2-314 *et* seq.

ii. Defendants have breached the implied warranty of merchantability in violation of N.D. Cent. Code §§ 41-02-31 and 41-02.1-21 et seq.

jj. Defendants have breached the implied warranty of merchantability in violation of Ohio Rev. Code Ann. §§ 1302.27 and 1310.19 et seq.

kk. Defendants have breached the implied warranty of merchantability in violation of Okla. Code Ann. tit. 12A §§ 2-314 and 2A-212 et seq.

ll. Defendants have breached the implied warranty of merchantability in violation of Or. Rev. Stat. §§ 72.3140 and 72A.2120 et seq.

mm. Defendants have breached the implied warranty of merchantability in violation of 13 Pa. Cons. Stat. §§ 2314 and 2A212 et seq.

nn. Defendants have breached the implied warranty of merchantability in violation of R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212 et seq.

oo. Defendants have breached the implied warranty of merchantability in violation of S.C. Code Ann. §§ 36-2-314 and 36-2A-212 et seq.

pp. Defendants have breached the implied warranty of merchantability in violation of S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212 et seq.

qq. Defendants have breached the implied warranty of merchantability in violation of Tenn. Code Ann. §§ 47-2-314 and 47-2A-212 et seq.

rr. Defendants have breached the implied warranty of merchantability in violation of Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

ss. Defendants have breached the implied warranty of merchantability in violation of Utah Code Ann. §§ 70A-2-314 and 70A-2A-212 et seq.

tt. Defendants have breached the implied warranty of merchantability in violation of Va. Code Ann. §§ 8.2-314 and 8.2A-212 et seq.

uu. Defendants have breached the implied warranty of merchantability in violation of Vt. Stat. Ann. tit. 9A §§ 2-314 and 2A-212 *et* seq.

vv. Defendants have breached the implied warranty of merchantability in violation of Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212 et seq.

ww. Defendants have breached the implied warranty of merchantability in violation of W. Va. Code §§ 46-2-314 and 46-2A-212 et seq.

xx. Defendants have breached the implied warranty of merchantability in violation of Wis. Stat. §§ 402.314 and 411.212 et seq.

yy. Defendants have breached the implied warranty of merchantability in violation of Wyo. Stat. §§ 34.1-2-314 and 34.1-2.a-212 et seq.

260. Plaintiff and members of the Classes have been financially injured and have sustained an ascertainable loss by reason of Defendants' conduct. Defendants'

PKE-equipped vehicles are inferior and have not been remedied. Plaintiff and members of the Damages Class have sustained a financial injury in an amount to be proven at trial.

261. Plaintiff and members of the Classes were injured as a result of Defendants' representations and intentional material omissions.

## SIXTH CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes

262. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 261 as though set forth herein.

263. As a direct and proximate result of Defendants' unfair, deceptive, fraudulent and/or unconscionable commercial conduct, Plaintiff and members of the Classes were injured by virtue of Defendants' refusal to disclose the vehicle vulnerabilities stemming from the PKE systems in Honda and Acura vehicles. Defendants engaged in unfair, deceptive, fraudulent or unconscionable acts or practices in violation of the state consumer protection statutes as alleged herein.

264. By engaging in the foregoing conduct, Defendants have violated the following state unfair trade practice statutes and/or consumer protection laws:

a. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ala. Code §§ 8-19-1 *et seq.*

b. Defendants have engaged in unfair competition or unfair acts or practices in violation of Alaska Stat. Ann. §§ 45.50.471 et seq.

c. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522 et seq.

d. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ark. Code Ann. §§ 4-88-101 et seq.

e. Defendants have engaged in unfair competition or unfair acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

f. Defendants have engaged in unfair competition or unfair acts or practices in violation of Colo. Rev. Stat. §§ 6-1-101 et seq.

g. Defendants have engaged in unfair competition or unfair acts or practices in violation of Conn. Gen. Stat. Ann. §§ 42-110a et seq.

h. Defendants have engaged in unfair competition or unfair acts or practices or made false representations in violation of D.C. Code §§ 28-3901 et seq.

i. Defendants have engaged in unfair competition or unfair acts or practices in violation of 6 Del. Code §§ 2511 et seq.

j. Defendants have engaged in unfair competition or unfair acts or practices in violation of Fla. Stat. §§ 501.201 et seq.

k. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ga. Code Ann. §§ 10-1-390 et seq.

l. Defendants have engaged in unfair competition or unfair acts or practices in violation of Haw. Rev. Stat. §§ 480-1 et seq.

m. Defendants have engaged in unfair competition or unfair acts or practices in violation of Iowa Code §§ 714.16 et seq.

n. Defendants have engaged in unfair competition or unfair acts or practices in violation of Idaho Code Ann. §§ 48-601 et seq.

o. Defendants have engaged in unfair competition or unfair acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1 et seq.

p. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ind. Code §§ 24-5-0.5 et seq.

q. Defendants have engaged in unfair competition or unfair acts or practices in violation of Iowa Code §§ 714H.1 et seq.

r. Defendants have engaged in unfair competition or unfair acts or practices in violation of Kan. Stat. Ann. §§ 50-623 et seq.

s. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ky. Rev. Stat. §§ 367.110 et seq.

t. Defendants have engaged in unfair competition or unfair acts or practices in violation of La. Rev. Stat. §§ 51:1401 et seq.

u. Defendants have engaged in unfair competition or unfair acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207 et seq.

v. Defendants have engaged in unfair competition or unfair acts or practices in violation of Md. Code Com. Law §§ 13-101 et seq.

w. Defendants have engaged in unfair competition or unfair acts or practices in violation of Mass. Gen. Laws ch. 93A et seq.

x. Defendants have engaged in unfair competition or unfair acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901 et seq.

y. Defendants have engaged in unfair competition or unfair acts or practices in violation of Minn. Stat. §§ 325F.68 et seq., actionable under Minn. Stat. § 8.31, subd. 3a.

z. Defendants have engaged in unfair competition or unfair acts or practices in violation of Miss. Code Ann. §§ 75-24-1 et seq.

aa. Defendants have engaged in unfair competition or unfair acts or practices in violation of Mo. Rev. Stat. §§ 407.010 et seq.

bb. Defendants have engaged in unfair competition or unfair acts or practices in violation of Mont. Code Ann. §§ 30-14-101 et seq.

cc. Defendants have engaged in unfair competition or unfair acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 et seq.

dd. Defendants have engaged in unfair competition or unfair acts or practices in violation of Nev. Rev. Stat. §§ 598.0903 et seq.

ee. Defendants have engaged in unfair competition or unfair acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1 et seq.

ff. Defendants have engaged in unfair competition or unfair acts or practices in violation of N.J. Stat. Ann. §§ 56:8-1 *et* seq.

gg. Defendants have engaged in unfair competition or unfair acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1 et seq.

hh. Defendants have engaged in unfair competition or unfair acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 et seq.

ii. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1 et seq.

jj. Defendants have engaged in unfair competition or unfair acts or practices in violation of N.D. Cent. Code §§ 51-15-01 et seq.

kk. Defendants have engaged in unfair competition or unfair acts or practices in violation of Ohio Rev. Code Ann. §§ 1345.01 et seq.

ll. Defendants have engaged in unfair competition or unfair acts or practices in violation of Okla. Code Ann. tit. 15 §§ 751 et seq.

mm. Defendants have engaged in unfair competition or unfair acts or practices in violation of Or. Rev. Stat. §§ 646.605 et seq.

nn. Defendants have engaged in unfair competition or unfair acts or practices in violation of 73 Pa. Stat. Ann. §§ 201-1 et seq.

oo. Defendants have engaged in unfair competition or unfair acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1 et seq.

pp. Defendants have engaged in unfair competition or unfair acts or practices in violation of S.C. Code Ann. §§ 39-5-10 et seq.

qq. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1 et seq.

rr. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101 et seq.

ss. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code §§ 17.41 *et* seq.

tt. Defendants have engaged in unfair competition or unfair acts or practices in violation of Utah Code Ann. §§ 13-11-1 et seq.

uu. Defendants have engaged in unfair competition or unfair acts or practices in violation of Va. Code Ann. §§ 59.1-196 et seq.

vv. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451 et seq.

ww. Defendants have engaged in unfair competition or unfair acts or practices in violation of Wash. Rev. Code §§ 19.86.010 et seq.

xx. Defendants have engaged in unfair competition or unfair acts or practices in violation of W. Va. Code §§ 46A-6-101 et seq.

yy. Defendants have engaged in unfair competition or unfair acts or practices in violation of Wis. Stat. §§ 100.18 et seq.

zz. Defendants have engaged in unfair competition or unfair acts or practices in violation of Wyo. Stat. §§ 40-12-101 et seq.

265. Plaintiff and members of the Classes have been financially injured and sustained an ascertainable loss by reason of Defendants' unfair, deceptive, or unconscionable acts alleged herein. The loss is in the form of diminished value of the vehicle at the point of sale.

266. If the vehicle was stolen, additional damages include the total value of the vehicle plus increased insurance premiums, the cost of alternative transportation, lost time, inconvenience, anguish and unrecovered property in the vehicle.

267. These damages are of the type the state consumer protection statutes were designed to prevent and directly result from Defendants' unlawful conduct.

## SEVENTH CLAIM FOR RELIEF

### Common Law Fraud

268. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 267 as though set forth herein.

269. Defendants made material omissions concerning a presently existing or past fact regarding the nature of Defendants' PKE systems and the vehicles' vulnerability to relay theft, electronic software entry theft, or key cloning theft.

Defendants did not truthfully and fully disclose to their customers the true nature of the PKE systems (and their vulnerabilities) which were not easily discovered.

270. Defendants touted the superior quality of their PKE-equipped vehicles when they knew they were, in fact, highly vulnerable to keyless entry drive away theft while simultaneously failing to disclose the true nature of their PKE systems.

271. The omissions were made by Defendants with knowledge of their falsity, and with the intent that reasonable consumers, including Plaintiff and members of the Classes, would purchase or lease the affected vehicles without knowledge of the vulnerabilities.

272. Defendants' fraud also includes particularized affirmative misrepresentations. Defendants represented on their consumer website and in its model year 2024 Civic marketing materials that Smart Entry allows the driver to unlock and start the vehicle "all without ever touching a key," and that opening the trunk "only requires that drivers have the key fob with them."[81] These statements were false and misleading when made because, as a result of the Defect, the system also unlocks the vehicle and permits it to be started for persons who do not possess the key.

273. Plaintiff reviewed and relied on these representations before her 2023 purchase, as alleged above, and reasonably relied on Defendants' omission of the Defect. Had the Defect been disclosed, Plaintiff would not have purchased her vehicle or would have paid less for it. Members of the Classes were exposed to the same uniform representations and omissions.

274. Defendants' fraudulent concealment induced Plaintiff and members of the Classes to enter into their purchase and lease transactions. The fraud occurred before,

[81] *2024 Civic Sedan Feature Guide: Smart Entry and Push Button Start*, Honda Info Ctr., https://www.hondainfocenter.com/2024/Civic-Sedan/Feature-Guide/Exterior-Features/Smart-Entry-and-Push-Button-Start/ (last visited Oct. 19, 2026).

and independent of, any contract, and Defendants' duty not to conceal the Defect arises independently of their warranties.

275. As a direct and proximate result of Defendants' omissions and concealment, Plaintiff and members of the Classes suffered economic injury.

## EIGHTH CLAIM FOR RELIEF

### Unjust Enrichment

276. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 275 as though set forth herein.

277. Honda created the authorized dealership system and the sale of Honda vehicles through that authorized dealership system. Honda directly benefits from the sale of Honda vehicles through its authorized dealers.

278. Defendants have violated the unjust enrichment laws of every state, except Indiana and Ohio. Defendants have greatly benefited from their unlawful acts by failing to disclose to Plaintiff and members of the Classes the security vulnerabilities stemming from the Defendants' vehicles' PKE systems. This has caused Plaintiff and members of the Classes to pay more for Defendants' PKE-equipped vehicles and sustain financial injury. It would be inequitable for Defendants to be permitted to retain the benefit of increased revenue derived in the U.S. from their unlawful conduct. Plaintiff and members of the Classes are entitled to the establishment of a constructive trust consisting of the benefit received by Defendants as a result of the inequitable conduct alleged herein from which Plaintiff and the other members of the Classes may make claims on a *pro-rata* basis for restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A. That the Court determine that this action may be maintained as a class action;

B. That the Court determine that the alleged conduct among Defendants be declared, adjudged, and decreed to be unlawful, and enter an order enjoining such conduct in the future together with attorneys' fees and costs of suit;

C. That judgment be entered against Defendants on each claim;

D. That judgment be entered against Defendants, and in favor of Plaintiff and each Class member for damages, including treble damages where available, determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

E. That judgment be entered against Defendants, and in favor of Plaintiff and each member of the Class for reasonable attorneys' fees and costs of suit;

F. That judgment be entered against Defendants in favor of Plaintiff and each Class member for the maximum damages permitted under state laws determined to have been violated by them and for reasonable attorneys' fees and costs of suit;

G. That judgment be entered against Defendants and against Defendants' successors, assignees, subsidiaries, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, to perpetually enjoin and restrain them from, in any manner, directly or indirectly, continuing, maintaining, or renewing the unlawful conduct alleged herein together with attorneys' fees and costs of suit;

H. That judgment be entered establishing a constructive trust funded by Defendants' ill-gotten gains, from which Plaintiff and members of the Classes may seek restitution on a *pro-rata* basis;

I. That such appropriate equitable relief, including a temporary restraining order, preliminary or permanent injunction, be ordered or entered; and

J. That the Court order such other and further relief as may appear just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**AHDOOT & WOLFSON, PC**

DATED: October 29, 2026

/s/Jeff S. Westerman
Jeff S. Westerman (SBN 94559)
2600 W. Olive Ave., Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
jwesterman@ahdootwolfson.com

Michael M. Buchman (*pro hac vice forthcoming*)
William Kalema (*pro hac vice forthcoming*)
Christopher Hydal (*pro hac vice forthcoming*)
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017
Telephone: (212) 970-0300
Facsimile: (212) 970-0301
mbuchman@saverilawfirm.com
wkalema@saverilawfirm.com

Joseph R. Saveri (SBN: 130064)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com

Marvin A. Miller (*pro hac vice forthcoming*)
Matthew E. Van Tine (*pro hac vice forthcoming*)
Andrew Szot (*pro hac vice forthcoming*)
**MILLER LAW LLC**
53 West Jackson Blvd., Suite 1320
Chicago, IL 60604
Telephone: (312) 332-3400
mmiller@millerlawllc.com
mvantine@millerlawllc.com
aszot@millerlawllc.com

David H. Fink (*pro hac vice forthcoming*)
Nathan J. Fink (*pro hac vice forthcoming*)
Philip D.W. Miller (*pro hac vice forthcoming*)
**FINK BRESSACK**
38500 Woodward Avenue, Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkbressack.com
nfink@finkbressack.com
pmiller@finkbressack.com

Alan Rashkind (*pro hac vice forthcoming*)
James A. Cales III (*pro hac vice forthcoming*)
**Furniss, Davis, Rashkind and Saunders, P.C.**
6160 Kempsville Cir. Suite 341B
Norfolk, Virginia 23502
Telephone: (757) 461-7100
jcales@furnissdavis.com

Patrick E. Knie (*pro hac vice forthcoming*)
250 Magnolia Street
Spartanburg, SC 29304
Telephone: (864) 582-5118
pat@kniebeatty.com
**KBH Law Offices**

*Attorneys for Plaintiff and the Proposed Class*